Filed 7/11/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049626 |
| v. | (Super. Ct. No. SWF10001639) |
| ERIC DAYSHAWN SPEIGHT, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Albert J. Wojcik, Judge. Affirmed in part, reversed in part, and remanded for resentencing.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Eric Dayshawn Speight appeals from a judgment after a jury convicted him of two counts of premeditated, willful, and deliberate attempted murder and found true various enhancements. Speight argues the following: (1) the prosecutor committed prejudicial misconduct when she misstated the law concerning homicide and the error was compounded by the trial court's statements and omission of an instruction on the interaction between attempted murder and attempted voluntary manslaughter; and (2) his sentence was cruel and unusual punishment and he received ineffective assistance of counsel when defense counsel failed to object to part of his sentence

As we explain below, we agree the trial court erred in instructing the jury but conclude Speight was not prejudiced. With respect to his sentencing claim, we conclude defense counsel's performance was deficient regarding sentencing. We affirm the judgment, reverse Speight's sentence, and remand the matter for a new sentencing hearing.

FACTS

One evening in August 2010, Tonesha S. was at home in bed asleep with her boyfriend Richard S. when her brother Michael S. woke them and said 17-year-old Speight and a few other men had "jumped" him. Michael had visible injuries to his lip and forehead. Over the course of the following week, Tonesha called Speight approximately 60 times to learn why Speight hit Michael. Tonesha was very angry with Speight and she grew angrier when he avoided her calls. Cherlyn S., Tonesha's mother, tried to speak with Speight's mother concerning the incident without success.

On the afternoon of August 13, 2010, Tonesha, Richard, and their friends, Bryant/Brian W. and his girlfriend went to the mall where they saw Cherlyn, who had Tonesha and Richard's two children with her. Cherlyn told Tonesha that she was going to speak with Speight's mother. Tonesha was uncomfortable with Cherlyn taking Tonesha's children to speak with Speight's mother so Tonesha and the others followed in Tonesha's car.

2

Cherlyn stopped her car in front of Speight's residence, and Tonesha stopped her car about eight houses away. Bryant got out of Tonesha's car, walked to Cherlyn's car, and stood near the passenger door. Tonesha and Richard saw a woman, later identified as Kacharelle Butler, Speight's aunt, walk towards Cherlyn's car and speak with Cherlyn. When it appeared to Tonesha the conversation was becoming confrontational, Butler was making hand gestures, she drove her car and parked behind her mother's car. Tonesha got out of her car and joined the conversation, which evolved into an argument. Tonesha saw Speight and two men standing near the home's front door. Tonesha, who was very upset and frustrated, punched Butler on the face but did not make solid contact.

Tonesha saw Speight walking towards her with a gun, and Bryant lifted his shirt and turned around to show Speight he was not armed. Richard grabbed Tonesha and said they needed to leave quickly. Bryant said, "'Hey, watch out, he [*sic*] got a gun,'" and he ran away. Richard grabbed Tonesha's hand and began to run away. Tonesha heard a woman say to Speight, "'No, go back in the house, there's no need for that.'" Tonesha broke away from Richard and ran towards her car. Richard saw Speight shoot the gun in Bryant's direction but Bryant had turned the corner.

As Tonesha ran away, she heard the first shot. Speight chased her and when he got near her, he slowed down, aimed the gun at her, and fired. Tonesha heard a second shot "[a]nd it dropped [her] instantly." Tonesha, who was shot in the back, was lying face down on the ground. As Richard ran to Tonesha, Speight pointed the gun at Tonesha, and Richard said, "'She's already dead, why are you still shooting?'" Speight pointed the gun at Richard and shot him in the left shoulder. As Richard tried to pick up Tonesha, Speight shot Tonesha again, this time in the right shoulder.

Richard and Tonesha fled to a nearby home where they tried to get help. After Richard had Tonesha sit on the porch and he rang the doorbell, Richard walked away. Speight followed Richard, and Richard asked him what he was doing. Speight

3

pointed the gun at Richard and pulled the trigger, but there were no more bullets. It appeared to Richard that Speight smirked before he ran home. As Richard put Tonesha in Cherlyn's car, Richard saw Speight and the other man get into a car and drive away. Cherlyn drove away and flagged down an ambulance, which took Tonesha to the hospital; she suffered from critical injuries. Emergency personnel responded and transported Richard by helicopter to the hospital; his injury was superficial. Two years after the shooting Tonesha still suffered from a loss of mobility and sensation to her left arm. She had undergone one surgery and expected at least one more.

An amended information charged Speight with three counts of willful premeditated and deliberate attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] (count 1-Tonesha, count 2-Richard & count 3-Bryant). As to count 1, the information alleged Speight inflicted great bodily injury causing Tonesha to be comatose or suffer paralysis (§ 12022.7, subd. (b)). With respect to counts 1 and 2, the information alleged Speight personally discharged a firearm and caused great bodily injury (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)), and as to count 3, he personally discharged a firearm (§§ 12022.53, subd. (c), 1192.7, subd. (c)(8)). Finally, the information alleged Speight was 16 years of age or older at the time of the offenses (Welf. & Inst. Code, § 707, subd. (d)(1)).

At trial, the prosecutor offered Tonesha's testimony as described above. Additionally, Tonesha denied threatening Speight during any of her numerous telephone calls. She claimed neither she nor anyone else in her car had any weapons. She denied ever trying to run into the house. On cross-examination, Tonesha denied she threatened Speight during any of her telephone calls. She also denied being at Speight's house before the day of the incident or throwing a rock through his window. And Tonesha denied she threatened Speight when she saw him standing on the front porch before she

---

[1] All further statutory references are to the Penal Code.

4

hit Butler. Tonesha claimed she saw that Speight was armed before she hit Butler. She claimed Bryant did not threaten anyone when he walked to the house. On redirect examination, Tonesha stated she saw Speight had a gun after she hit Butler. On recross-examination, Tonesha was unsure whether Speight came out of the house with the gun before or after she hit Butler.

Butler testified for the prosecution. She explained that when Cherlyn stopped her car, there was a man walking towards the house. Butler stated that as she spoke with Cherlyn, the man approached Speight and tried to instigate a fight. She said Speight went inside to get his "fighting gloves" and went back outside. She said Speight went back inside and returned with a gun. Butler testified she asked Speight what he was doing and told him to put the gun away. She said the man sat in the car and shielded himself with the door. She claimed Speight put the gun back in the house. Butler said another car pulled up and a woman, Tonesha, got out of the car and tried to run into the house but when Butler told her the person that she was looking for was not in the house, the girl who told Speight that Michael had called her a derogatory name, Tonesha walked towards Butler and hit her. She stated there were two men who put their hands up like they wanted to fight her. She said that when Speight came back outside, he had the gun and told them to get away from his aunt and Butler went inside.

Thomas Chapman-Wright, an investigator with the Riverside Public Defender, testified he interviewed Butler telephonically after the incident. Butler told him that not only did Tonesha hit her, two men approached her with raised fists as if they were going to attack her and she was scared. Butler told him that Speight appeared with a gun and she told him to put it away. She thought the man in the car had a weapon.

Cherlyn testified for the prosecution. She explained that after Tonesha tried to hit Butler, she got out of her car to restrain Tonesha. She denied that anyone else, Richard or Bryant, threatened Butler or that they raised their fists. And she stated no one

5

had any weapons except Speight. On cross-examination, Cherlyn denied Tonesha tried to go into Speight's house or that Bryant challenged Speight to fight.

Richard testified concerning the incident as we describe above. He claimed no one in his party had any weapons. He stated neither he nor Bryant ever said anything to Butler or raised their fists to her.

Speight testified on his own behalf. He admitted that three or four days before the shooting he punched Michael in the face because he had disrespected a girl they both knew by calling her derogatory names. Speight claimed he then went home. At home, a mutual friend of Speight and Michael called and said Michael's sister and boyfriend were looking for Speight because they believed he was involved in Michael being "jumped." A few minutes later, a woman called Speight and asked him to come outside and fight Michael. Speight went outside and saw a car with a woman and man who he later learned were Tonesha and Richard. Speight told them he was not part of the group that assaulted Michael. At some point, Richard called Speight a "crab," a disrespectful name for a "Crip" gang member. After Speight denied he was a gang member, he asked Richard where he was from and Richard replied, "Eastside Bounty Hunter Watts." Speight was scared because he believed that to be a violent, retaliatory faction of the Bloods. Speight asked Richard his gang name, and Richard answered, "'Chaos.'" Tonesha insisted Speight was involved in the attack on her brother, and Richard tried to hit Speight but missed. They left, and Speight went inside. About 10 minutes later, Speight was on the telephone when he heard pounding on the door and 30 seconds later a loud crash; someone had thrown a brick through the window. Throughout the night Tonesha called Speight a few times and during one of the calls she threatened him and told him to come outside and fight Michael.

Speight stated that two days later Tonesha called and threatened everyone in his house. A few minutes later Tonesha called and threatened to kill everyone in his house unless Speight came outside and fought Michael. Speight described his level of

6

fear as a seven on a scale of one to 10. Speight admitted that the following day, his cousin, Mica Caruso, brought him a gun despite Speight's insistence he did not need it.

On the afternoon of the incident, Speight was at home with his brother Cordell Edwards, his aunt Butler and her two children, and friends Janae Young, Elton Satterwhite, Derrick Kendrick, and Erica Johnson. Speight said a man called him and told him to come outside and fight. Speight told Edwards, Satterwhite, and Kendrick they, Tonesha and Richard, were there and he put on his "fighting gloves." Speight testified he was scared and he and Edwards went upstairs where they looked out the window and saw a man walking towards the house and a car driving slowly. They went downstairs, looked out the front door, and saw Butler was outside. Butler was talking to the car's female driver, and a man stood in front of the car. The man was angrily yelling at Speight to come outside and fight because he hit Michael. Speight went upstairs and got the gun because he claimed he intended to scare them away. Speight stood at the front door holding the gun. The man told Speight he did not have a gun, lifted his shirt, and spun around, and Butler told Speight to put the gun away. Speight set the gun inside the front door. After the man told Speight to come outside and fight, Speight said he would and asked where Michael was. The man replied, "'It's too late for that. I got something for you.'" Speight claimed the man made a hand gesture simulating a gun. Speight thought he had a gun and described his fear level as a 10. Speight said he would come outside and guns were unnecessary. The man turned and walked towards the car. Speight claimed he thought the man was going to the car to get a gun. As Speight went inside to get the gun, he heard Satterwhite yell that they were "jumping" Butler who was standing near Tonesha and Richard. Speight said he ran outside and started shooting. He claimed he did not intend to shoot anyone and he only tried to scare them. Speight also claimed he did not remember anything between the first shot and the last shot because he blacked out. Speight described at length that he suffers from black outs when he is afraid

7

and it has happened many times. Speight repeated he did not intend to kill anyone. He remembered his hands were shaking and he denied grinning at anyone.

On cross-examination, Speight testified that when Tonesha and Richard ran towards the car he still considered them a threat because he believed they could have been going to the car to get a gun. Speight admitted he fled the scene, had someone cut his hair, and changed his clothes to alter his appearance. On redirect examination, Speight testified he was afraid and felt provoked because they came to his house, made the telephone calls, broke his window, tried to get him to go outside and fight, and acted as if they had guns.

Speight offered the following testimony in his defense. Lynette Edwards, Speight's mother, testified that one night a few days before the shooting, she was asleep when someone threw a rock through her front window. She yelled at Speight to fix the window. She did not call the police because it was late, she was tired, and she had to go to work the next morning. She stated Speight can become so angry and afraid he does not realize what he is doing or saying. Mica Caruso testified he spoke with Speight a few days before the shooting. Speight described to Caruso an incident that frightened Speight. Caruso, without any prompting from Speight, purchased an illegal gun and gave it to Speight. Speight's girlfriend, Young, testified a man tried to instigate a fight with Speight. She claimed Tonesha tried to run into the house. On rebuttal, Richard testified that before the shooting, he did not know where Speight lived and he had not confronted him.

During a hearing on the jury instructions, there was a discussion concerning the voluntary manslaughter instruction. Speight's defense counsel inquired whether the prosecutor and the trial court agreed the prosecutor was required to prove beyond a reasonable doubt Speight was not acting as a result of sudden quarrel or "incorrect self-defense." The prosecutor agreed and indicated she thought it was addressed. Counsel replied it was addressed in CALCRIM but was not sure if it was addressed in

8

CALJIC. The parties discussed where the instruction would be located in CALJIC. After the court inquired about counsel's concern, counsel explained the prosecutor had the affirmative burden of proving Speight did not act in the heat of passion or imperfect self-defense. The court stated it was undoubtedly the prosecutor's burden but it was unaware of any CALJIC instruction that made it a requirement and was unsure if one was necessary. Counsel distinguished the situation where the jury acquits on the charged offense and proceeds with the lesser included offenses and this situation where the prosecutor was required to prove "the lessers in order to" establish the charged offense. Counsel added, "You can't instruct the jury that they don't need to consider involuntary manslaughter only when they find him not guilty of attempt[ed] murder, they have to consider that along with [it]." Counsel argued the proposed instructions did not make that clear to the jury and it lowered the prosecution's burden of proof because it removed that issue from the jury. The court stated CALJIC No. 2.90's general instruction on burden of proof and reasonable doubt adequately covered counsel's concern. The court added: "It almost seems like you're saying before she gets to the attempted voluntary manslaughter, it's her burden of proof to establish he's not guilty of attempted murder. That's nonsensical. [¶] . . . [¶] You could put in it's her duty to prove beyond a reasonable doubt that he is guilty of the charged crimes and he is guilty of the lesser included offenses. It's her burden. It's her burden. It's her burden." Counsel stated it was going to argue language taken directly from CALCRIM No. 603, that if the prosecutor did not meet its burden of proving Speight did not act with heat or passion or in imperfect self-defense, the jury must acquit him of attempted murder. Counsel and the court debated whether the proposed instructions adequately covered that principle. The prosecutor did not object during the argument.

As relevant here, the trial court instructed the jury with the following instructions: CALJIC No. 8.66, Attempted Murder; CALJIC No. 8.11, Malice Aforethought; CALJIC No. 8.67, Willful, Deliberate, and Premeditated Attempted

9

Murder; CALJIC No. 8.41, Attempted Voluntary Manslaughter; CALJIC No. 8.42,[2] Sudden Quarrel or Heat of Passion and Provocation; CALJIC No. 8.43, Murder or Manslaughter Cooling Period; CALJIC No. 8.44, No Specific Emotion Alone Constitutes Heat of Passion; CALJIC No. 5.50.1 Prior Threats and Assaults by Victim; CALJIC No. 2.90, Presumption of Innocence--Reasonable Doubt--Burden of Proof; CALJIC No. 1.00, Respective Duties of Judge and Jury; CALJIC No. 17.49, Use of Multiple Verdict Forms; and CALJIC No. 17.10, Conviction of Lesser Included Offense. The court did not instruct the jury on the issue of the prosecution's burden to prove beyond a reasonable doubt an absence of heat of passion.

During closing argument, as relevant here, defense counsel argued Tonesha, Richard, and Cherlyn were biased because all were angry at Speight and they sanitized and minimized their own conduct. Counsel argued Tonesha and Richard

---

[2]  Because CALJIC No. 8.42 explains provocation and heat of passion we provide its text in full: "To reduce an unlawful attempted killing from attempted murder to attempted manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion. [¶] The heat of passion which will reduce attempted homicide to attempted manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up [his] own standard of conduct and to justify or excuse [himself] because [his] passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted [him] were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. Legally adequate provocation may occur in a short, or over a considerable, period of time. [¶] The question to be answered is whether or not, at the time of the attempted killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than judgment. [¶] If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful attempted killing of a human being followed the provocation and had all the elements of attempted murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

10

repeatedly threatened Michael to the point where Caruso, who was a gang member and knowledgeable about gangs, obtained a gun for Michael to protect himself. Counsel contended Speight was not guilty of attempted murder because he did not intend to kill Tonesha or Richard. After detailing the numerous threats, counsel argued Speight was provoked and he acted under the heat of passion. Counsel argued the prosecutor had to prove "there was either insufficient provocation or that the provocation never happened." Counsel made the same argument regarding imperfect self-defense. Counsel concluded Speight did not intend to kill anyone.

During rebuttal argument, as relevant here, the prosecutor argued: "Talked about heat of passion. Now, what's critical here -- and let me go back. In order to get to voluntary manslaughter, which I would suggest is not the option in this case, but in order to get to voluntary manslaughter, you would all have to agree that [Speight], when he chased after the victims and they are running for their lives and he shot them, you would have to all find him not guilty of attempted murder." Defense counsel objected the prosecutor misstated the law. The court stated: "That's when you get to it. You don't get to the attempted voluntary manslaughter unless there's a unanimous finding of not guilty to the attempt[ed] murder on any specific count. The jury instruction is [CALJIC No.] 17[.]49 or [CALJIC No.] 17[.]10 addressed that. But that's the law." Counsel began to say, "The law is [the prosecutor]" when the court interrupted and said, "No, [c]ounsel, I said what the law is. If, in fact, the jurors believe there's some confusion or dispute regarding the law, you follow the law in the jury instructions, not what anyone -- not what the attorneys tell you. [¶] You may proceed." The prosecutor continued with her rebuttal: "In order for you to get to even the lesser, which is voluntary manslaughter -- it's a lesser necessary included offense -- you would have to all agree that [Speight] is not guilty, or in addition to that, you would have to agree that the defense of heat of passion or the defense of he reasonably was in fear for his life, an

11

actual but unreasonable, you have to find that in order for you to even get down to voluntary manslaughter."

The jury convicted Speight of counts 1 and 2 and found true the accompanying enhancements, including that he was 16 years of age or older at the time of the offenses. The jury acquitted him of count 3 concerning Bryant.

The trial court sentenced 19-year-old Speight to prison as follows: count 1-an indeterminate term of seven years to life plus 25 years to life for discharging a firearm plus a five year determinate term for inflicting great bodily injury; and count 2-an indeterminate term of seven years to life plus 25 years to life for discharging a firearm. The court ordered the sentences on counts 1 and 2 to run consecutively because there were two victims. Thus, the court sentenced Speight to prison for a determinate term of five years plus 64 years to life.

DISCUSSION

*I. Jury Instructions*

Speight argues the prosecutor committed misconduct during rebuttal argument when she discussed the interaction between attempted murder and attempted voluntary manslaughter and the trial court "reinforced the misstatement by agreeing" the prosecutor's statement was legally correct. Noting the trial court instructed the jury with CALJIC and not CALCRIM, Speight adds the court erred in failing to instruct the jury sua sponte the prosecution had the burden to prove beyond a reasonable doubt that Speight did not act as a result of heat of passion. Speight does not spend much time explaining how the court erred in failing to instruct the jury on that point. Instead, Speight asserts the alleged instructional error compounded the prejudice caused by the prosecutor's and the court's misstatements to the jury.

The Attorney General first asserts the prosecutor did not misstate the law. Recognizing CALJIC No. 8.50 is a correct statement of law that would have provided the jury with the language Speight asserts was improperly omitted, the Attorney General

12

nevertheless contends there was no prejudicial instructional error. The Attorney General claims the other instructions properly informed the jury that to convict Speight of murder, the prosecution had to prove beyond a reasonable doubt Speight acted with malice aforethought, which necessarily meant the prosecution had to prove beyond a reasonable doubt Speight did not act as a result of heat of passion. As we explain below, we agree the trial court erred in failing to instruct the jury sua sponte with CALJIC No. 8.50.

Attempted murder requires a direct but ineffectual act towards killing a person and the person harbored express malice aforethought. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Attempted voluntary manslaughter is the unlawful killing of a person without malice. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran, supra,* 56 Cal.4th at p. 942, fn. omitted.)

This authority establishes that to prove the defendant guilty of attempted murder, the prosecution must prove beyond a reasonable doubt among other things, the

13

defendant acted with malice aforethought. To determine whether the defendant acted with malice aforethought, the prosecution must prove beyond a reasonable doubt, where heat of passion is at issue based on the state of the evidence, the defendant did not act as a result of heat of passion. Assuming the prosecution met its burden on this element, and attempted murder's other elements, the defendant is guilty of attempted murder. If, however, the prosecution fails to establish beyond a reasonable doubt the defendant did not act as a result of heat of passion, the prosecution fails its burden and the defendant is guilty of attempted voluntary manslaughter. (*People v. Rios* (2000) 23 Cal.4th 450, 461 (*Rios*) [mitigating circumstance of heat of passion "reduce[s] an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide'"].) Thus, when attempted murder and attempted voluntary manslaughter—heat of passion are before the jury, there is interaction between the two offenses.

Speight relies on this interaction to argue "[t]he prosecutor misstated the law when she stated that in order to even consider the lesser included offense of attempted voluntary manslaughter, the members of the jury had to first find [him] not guilty of attempted murder." It is of course improper for the prosecutor to misstate the law and particularly to absolve the prosecution from proving beyond a reasonable doubt all elements of a charged offense. (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) We do not, however, read the prosecutor's statements to forbid the jury from considering attempted voluntary manslaughter until they concluded he was not guilty of attempted murder. Nor do we read her statements as an attempt to somehow lessen her burden of proof. Read in their totality, we conclude the prosecutor simply informed the jury that to convict Speight of attempted voluntary manslaughter it had to first conclude he was not guilty of attempted murder.

14

Additionally, the trial court properly instructed the jury with CALJIC No. 17.10 concerning how the jury should approach deliberations on lesser included offenses and that it could not accept a verdict on a lesser crime until the jury acquitted on the charged crime, and CALJIC No. 17.49, concerning how the jury was to complete the verdict forms. The jury had a written copy of all the instructions during deliberations. It is well settled that if anything counsel says during argument conflicts with the trial court's jury instructions, the jury must follow the court's instructions. (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 152-153.) The trial court here instructed the jury with that legal requirement and any misstatement was remedied by the court's instructions. (CALJIC No. 1.00.) We turn now to Speight's claim the trial court erred in instructing the jury.

"[W]here the defendant killed intentionally and unlawfully, evidence of heat of passion, or of an actual, though unreasonable, belief in the need for self-defense, is relevant only to determine whether *malice has been established*, thus allowing a conviction *of murder*, or *has not been established*, thus precluding a murder conviction and limiting the crime to the lesser included offense of voluntary manslaughter. Indeed, in a murder case, unless the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger, it is the *defendant's* obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder. [Citations.] [¶] If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 . . . [(*Mullaney*)]), the People must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice. [Citations.] California's standard jury instructions have long so provided. [Citation.] In such cases, if the fact finder determines the killing was intentional and unlawful, but is not persuaded beyond reasonable doubt that provocation (or imperfect self-defense) was absent, it should acquit

15

the defendant of murder and convict him of voluntary manslaughter. [Citations.]" (*Rios, supra,* 23 Cal.4th at p. 462.)

"Of course, in a murder trial, the court, on its own motion, must fully instruct on every theory of a lesser included offense, such as voluntary manslaughter, that is supported by the evidence. [Citation.] Hence, where the evidence warrants, a murder jury must hear that provocation or imperfect self-defense negates the malice necessary for murder and reduces the offense to voluntary manslaughter." (*Rios, supra,* 23 Cal.4th at p. 463, fn. 10.)

As relevant here, the trial court instructed the jury that to convict Speight of attempted murder, it had to find he acted with express malice aforethought (CALJIC No. 8.66) as defined (CALJIC No. 8.11). The court also instructed the jury with CALJIC No. 8.67, Willful, Deliberate, and Premeditated Attempted Murder. That instruction, after providing the definitions for "'willful,'" "'deliberate,'" and "'premeditated,'" provides, "If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation*, it is attempt to commit willful, deliberate, and premeditated murder." (Italics added.) The instruction also provided, "The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true."

The trial court instructed the jury on attempted voluntary manslaughter with CALJIC No. 8.41, as follows: "Every person who unlawfully attempts [without malice aforethought] to kill another human being is guilty of the crime of attempted voluntary manslaughter in violation of sections 664 and 192, subdivision (a) . . ., a crime. [¶] Voluntary manslaughter is the unlawful killing of a human being [without malice aforethought]. [¶] [There is no malice aforethought if the [attempted killing] occurred [upon a sudden quarrel or heat of passion] [or] [in the actual but unreasonable belief in

16

the necessity to defend [oneself] [or] [another person] against imminent peril to life or great bodily injury].] [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A direct but ineffectual act was done by one person towards killing another human being; [and] [¶] 2. That person had the specific intent to kill another person . . . [; and] [¶] [3. The actions taken to kill were unlawful.] [¶] In deciding whether a direct but ineffectual act was committed, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the killing or devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill. The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design. [¶] [An attempt to kill is lawful if done in lawful [self-defense] [or] [defense of others].]"

Here, the trial court properly instructed the jury on the lesser included offense of attempted voluntary manslaughter. However, the court did not instruct the jury the prosecution had to prove beyond a reasonable doubt that Speight did not act as a result of heat of passion. That was error.

The Attorney General does not dispute, and we agree, the record includes sufficient evidence from which the jury could reasonably conclude Speight was provoked and he acted as a result of heat of passion. Tonesha admitted she called Speight 60 times over the course of about four days, conduct that cannot be described as anything but harassing. Speight testified that during at least two of those telephone calls, Tonesha threatened to kill everyone in his house. He also testified that a few days before the incident, Tonesha and Richard went to his house where Richard tried to hit him. On that occasion, Richard told Speight that he was a member of a Bloods gang Speight believed

17

to be particularly violent. Later that night, someone threw a brick through Speight's window. Speight's mother's testimony corroborated the vandalism to her home. Speight repeatedly testified he was scared because he believed Richard was a gang member.

On the day of the incident, Speight stated there was a man outside his house angrily yelling at him to come outside and fight. Speight stated the man made a gesture with his hand simulating a gun and when the man turned and walked towards his car, Speight thought the man was getting a gun from his car. Speight stated that when he went inside to get his gun, he heard his friend yell they were jumping Butler, his aunt. Speight explained he went outside and started firing his gun with the intent to scare them and he blacked out as he had in the past when he becomes scared. Without expressing any opinion on the likelihood of success of this defense, the record certainly includes sufficient evidence that could support Speight's claim he was provoked and acted as a result of heat of passion. Thus, the trial court properly instructed the jury with CALJIC No. 8.41. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709 [victim must cause provocation and provocation caused ordinary person to act rashly or without due caution and circumspection].) But the trial court fell short in its duty to instruct the jury completely on this theory.

CALJIC No. 8.50 in relevant part provides: "The distinction between murder . . . and manslaughter is that murder . . . requires malice while manslaughter does not. [¶] When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation,] [or] [in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury,] the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent. [¶] *To establish that a killing is murder . . . and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done [in the heat of passion or upon a sudden quarrel]*

18

*[or] [in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury]*."[3]  (Italics added.)

Thus, the trial court erred in failing to instruct the jury sua sponte with CALJIC No. 8.50, that the prosecution was required to prove beyond a reasonable doubt that Speight did not act as a result of heat of passion.  We conclude, however, Speight was not prejudiced because the instructional error was harmless even under the heightened federal constitutional standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.

In *People v. Wharton* (1991) 53 Cal.3d 522, 569 (*Wharton*), the trial court rejected defendant's proposed special instruction on provocation and heat of passion because a portion of it was an incorrect statement of law and other portions were covered in other instructions.  The California Supreme Court stated:  "Finally, although the jury was not directly instructed that provocation could occur over a 'considerable period of time,' the jury was instructed that a killing is first degree murder if it is 'the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not upon sudden heat of passion.'  (See CALJIC No. 8.20.)  By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing.  This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion— even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction."  (*Wharton, supra,* 53 Cal.3d at p. 572; *People v. Mincey*

---

[3]      We note the CALCRIM instruction concerning attempted voluntary manslaughter, heat of passion, CALCRIM No. 603, includes this requirement.  It states:  "The People have the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of attempted murder."

19

(1992) 2 Cal.4th 408, 438 [when jury found torture murder special circumstance true necessarily resolved against defendant factual questions on manslaughter].)

Speight could not have been prejudiced by the trial court's failure to instruct the jury with CALJIC No. 8.50 because "the jury necessarily resolved the factual question adversely" to him when it found him guilty of attempted murder. In instructing the jury, the trial court stated that if the jury concluded Speight was guilty of attempted murder, it then had to determine whether he committed the offenses willfully, deliberately, and with premeditation. The court instructed the jury with CALJIC No. 8.67, which properly and completely explained those principles. After finding Speight guilty of two counts of attempted murder, the jury made the additional finding he acted willfully, deliberately, and with premeditation. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion. Thus, we conclude the instructional error was harmless beyond a reasonable doubt.

## II. Cruel and Unusual Punishment

Relying on *Graham v. Florida* (2010) 560 U.S. 48, 73 (*Graham*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), Speight argues his 69 years to life sentence constitutes a de facto life sentence because he was a juvenile offender who will not be eligible for parole until he is 88 years old, which is after his natural life expectancy. He also argues the two 25-years-to-life firearm enhancements constitute cruel and unusual punishment because the sentences were grossly disproportionate to the facts of the case, and he received ineffective assistance of counsel because defense counsel did not object to imposition of the enhancements.

The Attorney General contends neither *Graham* nor *Caballero* are controlling here. The Attorney General asserts the trial court did not sentence Speight to life without the possibility of parole, and in fact he will be eligible for parole when he is 75 years and seven months old, an age within his life expectancy of 76 years. Based on

20

the fact the trial court read and considered the probation report, the Attorney General argues the court followed *Cabellero* and considered Speight's age at the time of sentencing. Recognizing however such a conclusion may require somewhat of a leap of faith, the Attorney General adds that if we disagree, this court should vacate the sentence and remand the matter for resentencing. As to Speight's second contention, the Attorney General contends that based on well-settled case authority, the sentence on the firearm enhancements was not cruel and unusual punishment, and thus defense counsel was not ineffective for failing to interject a futile objection.

Speight responds that even if his first parole hearing is when he is 75 years and seven months old, his sentence is the functional equivalent of a life sentence. He also states imposition of the 25-year firearm enhancements was cruel and unusual punishment because they were grossly disproportionate to the offender and the offense and defense counsel provided deficient performance because of the facts of the case.

Although the Attorney General limits his forfeiture argument to the firearm enhancements, based on our review of the record we conclude Speight's defense counsel did not object on cruel and unusual punishment grounds as to any aspect of the sentence either before the sentencing hearing by filing a sentencing brief or during the hearing. Other than defense counsel's objection to one of the aggravating circumstances, counsel submitted at the hearing.

A defendant's failure to contemporaneously object his sentence constitutes cruel and unusual punishment forfeits that claim on appellate review. (*People v. Gamache* (2010) 48 Cal.4th 347, 403; *People v. Mungia* (2008) 44 Cal.4th 1101, 1140-1141; *People v. Wallace* (2008) 44 Cal.4th 1032, 1096; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 997; *People v. Burgener* (2003) 29 Cal.4th 833, 886-887; *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045; *People v. Norman* (2003) 109 Cal.App.4th 221, 229-230.) A claim a sentence is cruel and unusual is forfeited on appeal if it is not raised in the trial court because the issue often requires a fact-bound inquiry. (*People v.*

21

*Russell* (2010) 187 Cal.App.4th 981, 993 [type of issue that should be raised in trial court because trial judge after hearing evidence in better position to evaluate mitigating circumstances and determine their impact on constitutionality of sentence]; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.) Thus, Speight has forfeited his claims his sentence was cruel and unusual punishment. That does not end our inquiry, however, as we must now address Speight's contention he received ineffective assistance of counsel. We conclude he did.

"Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 351.) "A defendant claiming ineffective assistance of counsel must satisfy *Strickland's* [*Strickland v. Washington* (1984) 466 U.S. 668] two-part test requiring a showing of counsel's deficient performance and prejudice. [Citation.] As to deficient performance, a defendant 'must show that counsel's representation fell below an objective standard of reasonableness' measured against 'prevailing professional norms.' [Citation.] 'Judicial scrutiny of counsel's performance must be highly deferential,' a court must evaluate counsel's performance 'from counsel's perspective at the time' without 'the distorting effects of hindsight,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 75.)

In *Caballero, supra,* 55 Cal.4th at page 268, the California Supreme Court held "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." The court specified that in future cases, "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his

22

or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Id.* at pp. 268-269.)

The California Supreme Court filed its decision in *Caballero* on August 16, 2012. (*Caballero, supra,* 55 Cal.4th 262.) The sentencing hearing in this case was on September 21, 2012. Although we give great deference to counsel's performance, counsel's performance regarding sentencing was deficient. Again, defense counsel did not raise the issue of cruel and unusual punishment either by motion or during the sentencing hearing. Based on these lapses, we conclude defense counsel's representation fell below an objective standard of reasonableness concerning sentencing.

We also conclude Speight was prejudiced by this error. Speight was a juvenile when he committed the crime, he did not have any prior criminal history, and he showed remorse at the sentencing hearing. These are just some of the mitigating factors a trial court would consider when assessing a cruel and unusual punishment claim pursuant to *Caballero*. Thus, Speight was certainly prejudiced by defense counsel's failure to object to his sentence based on cruel and unusual punishment grounds. Under these circumstances it is appropriate for us to remand the case to the trial court for a new sentencing hearing.[4] (§ 1260.)

---

[4] Although we need not reach the issue because we remand for a new sentencing hearing, based on the Attorney General's calculations, Speight would not be eligible for parole until about five months before his natural life expectancy ends. Such a sentence is a de facto life sentence.

23

DISPOSITION

The convictions are affirmed, the sentence is reversed, and the matter remanded to the trial court for a new sentencing hearing. In light of this disposition, the clerk of this court is directed to give the required notice to the California State Bar and to trial counsel. (Bus. & Prof. Code, § 6086.7; Cal. Rules of Court, rule 10.1017.)


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.