Filed 9/25/15  P. v. Uriarte CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LOREN JASON URIARTE,<br><br>        Defendant and Appellant. | A140223<br><br>(Sonoma County<br>Super. Ct. No. SCR-633294) |

Defendant Loren Jason Uriarte was sentenced to serve 12 years 8 months in state prison after a jury convicted him of attempted robbery and found true an allegation that he used a firearm during the commission of the offense. Defendant challenges his sentence on appeal, claiming that imposition of a 10-year firearm use enhancement under Penal Code[1] section 12022.53 violates equal protection principles because he could have received a lesser sentence based on the same conduct if the firearm use enhancement had been charged under section 12022.5. He also argues that the 10-year enhancement constitutes cruel and unusual punishment in light of the nature of the crime, the absence of any injury, and his lack of a criminal record. We reject these contentions and shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Thomas Pollock was in the business of selling inexpensive home theater sound system speakers in parking lots. On the morning of April 23, 2013, in the parking lot of

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

1

The Home Depot in Rohnert Park, he offered to sell speakers to two young men, Curtis Tornai and Anthony Merciari. Pollock had purchased the speakers for $55 but told the men they were worth $2,000. The men offered to pay $300 but said they needed to go to the bank to get the money. Pollock accepted the offer and followed the men in his truck, loaded with speakers, as they drove off in their Corvette.

Pollock became concerned when Tornai and Merciari drove to an apartment complex instead of a bank. He noted the Corvette's license plate in his phone. Tornai and Merciari got out of the Corvette, told Pollock they were going for the money, and walked around behind the apartment complex. After waiting about 20 minutes, Pollock was about to drive away when he saw another man come out of the complex and walk to a parked BMW. Pollock drove up and asked the man, later identified as defendant, if he was interested in buying speakers. When defendant said he wanted to see the speakers, Pollock pulled over, got out of the truck, and opened the back to show the speakers to defendant.

Tornai and Merciari returned as defendant was examining the speakers. The two men seemed to be friends of defendant and stood nearby as Pollock and defendant continued to talk. The men repeatedly asked Pollock whether the speakers were stolen.

After about five minutes, defendant pulled a semiautomatic handgun from his waistband, pulled the slide back to place a round into the chamber, and pointed the gun at Pollock from two feet away. He said, "[S]ince you came up on these can I come up on these too . . . ." An officer who testified at trial stated that "come up on" is a slang term meaning something was likely stolen or otherwise not legitimately acquired. Pollock was terrified and ran through some nearby bushes to the street while dialing 911 on his cellphone. He left his truck running. As Pollock was running, defendant told him that if Pollock called the police on them, he would call the police on Pollock. Merciari and Tornai fled in the Corvette. Defendant returned to his apartment where he left the gun and then drove off in his BMW.

Pollock told the 911 dispatcher that he was carjacked at gunpoint. When the police arrived, Pollock gave the officers the license plate number of the Corvette. He also

2

provided descriptions of the gun, the men, and the BMW. After taking an inventory of the speakers in his truck, Pollock found that one speaker system was missing and another was on the ground near the truck. A detective checked the license plate number of the Corvette and learned that it was registered to Tornai.

Meanwhile, defendant parked his BMW a few blocks from the apartment complex and called his friend Hamid Aimaq to pick him up. Aimaq and defendant then went to meet Merciari and Tornai. Defendant and Tornai bragged to Aimaq that they tried to rob "a guy" of his stereo speakers that were supposedly worth $1,400. They told Aimaq that the man took off and called the police, so everyone "jumped in the cars and booked it."

Police officers arrived at Tornai's address as defendant, Tornai, Aimaq, and two others walked out of the residence. They got into a nearby car and drove off. Officers stopped the car and detained the men for a show up. Pollock was transported to the scene, where he identified defendant as the man with the gun. He also identified Tornai and claimed he recognized Aimaq, whom he identified with "60 percent" certainty as the passenger in Tornai's car.

A detective interviewed defendant, who waived his *Miranda* rights. Defendant told the detective that he was at his apartment when Tornai and Merciari called to tell him about the speakers. According to defendant, one of the two men suggested stealing the speakers from Pollock. Defendant sent them a text telling them that it would be a "bad idea." When Tornai and Merciari arrived at defendant's apartment complex, he went outside and Pollock approached him. Defendant acknowledged that he had a gun in his waistband during the discussion with Pollock. He claimed he was going shooting with his father that weekend and intended to place the gun in his BMW. He admitted taking the gun out of his waistband during the discussion, although he claimed he did so to prevent the gun from falling from the waistband and not to threaten Pollock. He claimed the gun was unloaded and that the magazine was in his pocket. According to defendant, Pollock "freaked out" when he saw the gun and ran away while saying he was calling the cops. Defendant initially told the detective he had discarded the gun but later admitted that he stashed it in his room and had driven off to avoid the police.

3

Officers searched defendant's home. A 40-caliber semiautomatic handgun was found in a bedroom nightstand, along with several vials of testosterone and a digital scale. The gun was loaded and in working order. In a closet, officers found five pounds of marijuana, three cell phones, and packaging material.

After officers found the marijuana, another detective with experience in the narcotics unit spoke to defendant. Defendant told the detective that he had a doctor's recommendation for marijuana but that he was not a member of a cooperative. He also told the detective they would find four pounds of marijuana in his apartment. He claimed it was the yield from the previous season's grow in Lake County. The detective reviewed text messages on defendant's cell phone and concluded that, although many were written in code, they were consistent with marijuana trafficking.

Merciari and Tornai testified for the defense at trial. Both denied seeing defendant pull a gun on Pollock, although they acknowledged that Pollock ran away suddenly and yelled that he would call the police. Defendant's father testified that defendant owned the handgun for target practice, and that he and defendant often went shooting together in a remote area. According to the father, they had plans to meet at defendant's apartment, drive to the father's house in Lake County, and go shooting the next day.

The Sonoma County District Attorney filed a three-count information charging defendant with second degree robbery (§ 211), possession of marijuana for sale (Health & Saf. Code, § 11359), and misdemeanor possession of a steroid (Health & Saf. Code, § 11377, subd. (b)(1)). As to the robbery charge, the district attorney alleged that defendant had personally used a firearm. (§ 12022.53, subd. (b).)

A jury found defendant not guilty of second degree robbery but guilty of the lesser included offense of attempted robbery, and it found the firearm use enhancement true. The jury also found defendant guilty of the two drug counts. The court sentenced defendant to 12 years 8 months in state prison, composed of the midterm of 2 years for attempted robbery (§§ 211, 664), plus 10 years for the firearm use enhancement (§§ 12022.53, subd. (b), 664), plus one-third of the 2-year midterm, or 8 months, for possessing marijuana for sale (Health & Saf. Code, § 11359). Defendant timely appealed.

4

## 1.    *Equal Protection*

On appeal, defendant contends that the 10-year firearm use enhancement imposed under section 12022.53 violates the Fourteenth Amendment right to equal protection because it imposes a mandatory sentence for conduct that, under section 12022.5, allows the court to impose a lower sentence in its discretion.

Before addressing the substance of defendant's equal protection claim, we first consider the Attorney General's contention that defendant waived his right to pursue the issue on appeal by failing to object at trial. The Attorney General relies in part on *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1502–1503, in which the defendant raised an equal protection claim for the first time on appeal, claiming that the crime for which he was prosecuted expressly prohibited a grant of probation whereas a comparable but more serious offense permitted a defendant to be placed on probation. The appellate court in *Pecci* concluded that the defendant had forfeited the equal protection claim by failing to challenge the probation ineligibility clause on equal protection grounds in the trial court. (*Id.* at p. 1503.)

Defendant acknowledges that the equal protection contention was not made in the trial court but claims that it raises solely legal issues on undisputed facts and is therefore appropriately raised on appeal for the first time. Defendant urges the court to exercise its discretion to entertain the claim even if the contention was forfeited as a result of the lack of an objection. To avoid any suggestion that defendant's trial counsel was ineffective for failing to make the objection, we shall exercise our discretion to consider the merits of the contention without deciding whether the claim was forfeited in the trial court.

The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The California Constitution likewise prohibits the denial of equal protection. (Cal. Const., art. I, § 7, subd. (a).) " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' " (*In re Eric J.* (1979) 25 Cal.3d 522, 531.)

Defendant bases his equal protection argument on the correct assertion that the firearm use enhancement could have been charged under section 12022.5, which affords the court discretion to impose a lesser penalty than the 10 years mandated by section 12022.53, subdivision (b). Section 12022.5, subdivision (a) provides: "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." While section 12022.5 applies to the use of a firearm in the commission of any felony or attempted felony, section 12022.53 applies only to the use of a firearm in the commission of specified felonies that are more serious in nature.[2] Section 12022.53 applies only to felonies listed in subdivision (a) of that section, including murder, rape, robbery, and attempts to commit those crimes. Subdivision (b) of section 12022.53 provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."

In the case of a defendant who uses a firearm in the commission of one of the serious felonies enumerated in section 12022.53, the prosecutor has discretion to charge the firearm use enhancement under section 12022.53, which provides for a mandatory 10-year term, or section 12022.5, which affords the trial court discretion to impose a term of 3, 4, or 10 years. Defendant asserts that persons who use a firearm in the commission of a robbery and are charged under section 12022.53, subdivision (b) are similarly situated to persons who commit the same offense but are charged under section 12022.5, subdivision (a) especially in cases where the firearm was not discharged and no one was injured. Therefore, he argues, charging him with the enhancement under section

---

[2]The crimes enumerated in section 12022.53, subdivision (a) largely correspond to crimes defined as violent or serious felonies in sections 667.5, subdivision (b) and 1192.7, subdivision (c), respectively.

12022.53 constitutes a denial of his right to equal protection. (See, e.g., *People v. Brown* (2012) 54 Cal.4th 314, 328.)

However, " ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." ' " (*People v. Brown, supra,* 54 Cal.4th at p. 328.) The enactment of a statute imposing a greater penalty for more serious offenses, even though the same conduct may fall within the scope of a broader statute with a lesser penalty, does not constitute the adoption of such a discriminatory classification. Defendant's precise claim was rejected in *People v. Taylor* (2001) 93 Cal.App.4th 318 (*Taylor*). In *Taylor,* the defendant was convicted of attempted robbery with personal use of a firearm under section 12022.53, subdivision (b). (*Taylor, supra,* 93 Cal.App.4th at p. 320.) He asserted that his right to "equal protection [was] violated because the prosecution elected to charge a section 12022.53 enhancement, depriving the trial court of the sentencing discretion it would have had [if] defendant [had] instead been charged with a different gun enhancement provision, i.e., section 12022.5, which carries a sentence enhancement of three, four or ten years." (*Taylor,* at p. 323.) The *Taylor* court rejected the equal protection claim, reasoning: " ' "Prosecutors have great discretion in filing criminal charges. [Citation.] This discretion includes the choice of maximizing the available sentence (including charging of enhancements) to which a defendant might be exposed in the event of conviction [citations] and the timing of filing unrelated charges [citations]. Such discretion does not violate equal protection." ' " (*Id.* at p. 323.)

Defendant attempts to distinguish *Taylor* and claims it is inapposite because the court there compared the treatment of two different crimes under section 12022.53— attempted robbery and assault with a firearm. One aspect of the equal protection claim in *Taylor* was whether firearm use during an attempted robbery should be treated the same as firearm use during an assault with a firearm. However, another, distinct equal protection claim in *Taylor* is the precise one presented here— whether equal protection principles are violated when the prosecutor elects to charge the firearm use enhancement

7

under section 12022.53 instead of section 12022.5. (*Taylor, supra,* 93 Cal.App.4th at p. 323.) Defendant is mistaken in arguing that *Taylor* is distinguishable or inapposite.

*Taylor* is one in a line of cases holding that differences in treatment of a criminal defendant based on prosecutorial discretion ordinarily do not implicate equal protection. (See *People v. Ray* (1996) 13 Cal.4th 313, 359 [prosecutorial discretion to seek death penalty does not offend equal protection principles]; *People v. Keenan* (1988) 46 Cal.3d 478, 505 [same]; *People v. Stewart* (2004) 119 Cal.App.4th 163, 173–174 [prosecutorial discretion to try crimes committed on different dates together does not violate equal protection even though it subjects defendant to potentially harsher sentence].)

In *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 568–569, our Supreme Court rejected an equal protection challenge to Welfare and Institutions Code section 707, subdivision (d)(1), which grants prosecutors discretion to file charges in criminal court against a minor who is at least 16 years old. The court explained: "all minors who meet the criteria enumerated in [Welfare and Institutions Code] section 707 [, subdivision] (d) equally are subject to the prosecutor's discretion whether to file charges in criminal court. Any unequal treatment of such minors who commit the same crime under similar circumstances results solely from the decisions of individual prosecutors whether to file against particular minors a petition in juvenile court or instead an accusatory pleading in criminal court. Although, as petitioners assert, a prosecutor's decision in this regard can result in important consequences to the accused minor, so does a decision by a prosecutor to initiate criminal charges against *any* individual, including an adult. Claims of unequal treatment by prosecutors in selecting particular classes of individuals for prosecution are evaluated according to ordinary equal protection standards. [Citation.] These standards require the defendant to show that he or she has been singled out deliberately for prosecution on the basis of some invidious criterion, and that the prosecution would not have been pursued except for the discriminatory purpose of the prosecuting authorities. [Citation.] '[A]n invidious purpose for prosecution is one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement interests . . . .' "

8

Here, defendant does not allege any discriminatory motive by the prosecutor in charging a firearm use enhancement under section 12022.53, subdivision (b), as opposed to section 12022.5, subdivision (a). Consequently, defendant's equal protection claim lacks merit.

## 2.     *Cruel and Unusual Punishment*

Defendant next contends that the 10-year consecutive term imposed for firearm use violates the constitutional proscription against cruel and unusual punishment. He argues that the term is excessive and disproportionate given that no one was harmed and nothing was stolen, and he emphasizes his lack of a prior criminal record.

At the outset, we must again address whether defendant forfeited this claim by failing to object on this ground in the trial court. As defendant concedes, the issue is being raised for the first time on appeal. He nevertheless argues that the waiver rule cannot be applied because the sentence violates the state and constitutional guarantees against cruel and unusual punishment. We disagree. It is well settled that "[a] defendant's failure to contemporaneously object that his sentence constitutes cruel and unusual punishment forfeits the claim on appellate review. [Citations.] A claim a sentence is cruel and unusual is forfeited on appeal if it is not raised in the trial court because the issue often requires a fact-bound inquiry." (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 403; *People v. Mungia* (2008) 44 Cal.4th 1101, 1140–1141.) By failing to object below, defendant deprived the trial court of the ability to prepare a fully developed record necessary to evaluate his contention, which turns not only on the circumstances of the crime but also on factors unique to the individual defendant. Although we conclude that defendant forfeited his cruel and unusual punishment claim, we shall nonetheless exercise our discretion to consider his contention based upon the record before us, thus avoiding any suggestion of ineffective assistance of counsel.

Punishment that is grossly disproportionate to the offender's culpability violates constitutional norms prohibiting "cruel and unusual" (U.S. Const., 8th amend.) and "cruel or unusual" (Cal. Const., art. I, § 17) punishment. (See *Harmelin v. Michigan* (1991)

9

501 U.S. 957, 997 [111 S.Ct. 2680, 115 L.Ed.2d 836] (conc. opn. of Kennedy, J.); *People v. Dillon* (1983) 34 Cal.3d 441, 478.) The Eighth Amendment to the United States Constitution "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108].) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Id.* at p. 23.) Our Supreme Court has concluded that a "punishment may violate the California constitutional prohibition [against cruel or unusual punishment] 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*Dillon, supra,* at p. 478.) It is appropriate to consider the nature of both the offense and the offender. (*Id.* at p. 479.) "In assessing the nature of the offense, a court should consider . . . the defendant's motive, the way the crime was committed, the extent of his involvement and the consequence of his acts. [Citation.] In analyzing the nature of the offender, a court should consider his 'age, prior criminality, personal characteristics, and state of mind.' " (*People v. Felix* (2003) 108 Cal.App.4th 994, 1000 (*Felix*).) A defendant bears a "considerable burden" to show the requisite disproportionality. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

The Court of Appeal rejected a claim similar to the one defendant raises in *Felix, supra,* 108 Cal.App.4th 994. There, the defendant pulled a gun and carjacked a woman. After driving a short distance, he released her unharmed after allowing her to remove items from the glove compartment. (*Id.* at pp. 997–998.) At sentencing, the trial court cited the defendant's apparent lack of a criminal record, his youth, and his psychological problems in concluding that a mandatory 10-year firearm use enhancement constituted cruel or unusual punishment. (*Id.* at p. 999.) The Court of Appeal reversed.

With respect to the offense, the *Felix* court observed that the defendant planned the crime, secured a gun, and completed the crime by using the gun on the victim, all for personal financial gain. (*Felix, supra,* 108 Cal.App.4th at p. 1000.) The defendant attempted to avoid detection by "getting rid of the gun and denying involvement in the

10

offense." (*Ibid.*) The court noted that, although the victim was not scared at first, she became fearful based upon the defendant's gun use, and while the crime was not particularly violent, the offense itself was inherently dangerous, regardless of the lack of extreme violence. (*Id.* at pp. 1000–1001.)

Turning to facts unique to the offender, the *Felix* court was "not persuaded the punishment is grossly disproportionate to Felix's individual culpability based on his personal characteristics." (*Felix, supra,* 108 Cal.App.4th at p. 1001.) The court noted that the defendant "was not passive in carjacking the [victim's vehicle]," nor was he passive in attempting to cover up the crime by changing the license plate of the car and giving false information to the police. (*Ibid.*) The defendant was the "leader, not the follower," and his conduct was "premeditated, not spontaneous." (*Ibid.*) The court also observed that the defendant displayed "no remorse for his crime." (*Ibid.*) And, although the defendant "had no documented criminal history," the "lack of a criminal record is not determinative in a cruel or unusual punishment analysis." (*Ibid.*) The court also concluded that the defendant's youth did not warrant a mitigation in punishment, reasoning that although he was under 18 years old when he committed the offense, he did not display the level of immaturity seen in other cases involving juveniles. (*Ibid.*)

The factors evaluated by the *Felix* court are largely applicable here. Defendant was the leader in perpetrating the offense. He repeatedly accused Pollock of selling stolen speakers and then drew his loaded gun, racked a round into the chamber, and pointed the gun at Pollock at close range. He plainly believed he could rob Pollock with impunity because he assumed Pollock was dealing in stolen speakers. Defendant's plans were thwarted when Pollock called defendant's bluff and dialed 911. Then defendant attempted to cover up his crime by hiding his gun in his bedroom, moving his BMW to avoid detection, and calling his friend for a ride to another location. He bragged to his friends about the attempted robbery and later lied to the police about his involvement in the crime, his use of the gun during the attempted robbery, and the fact the gun was loaded. Although defendant complains that no one was harmed and nothing was actually stolen, Pollock interpreted defendant's actions as violent and life-threatening. Pointing a

loaded, cocked gun at a robbery victim from two feet away is an inherently dangerous act, regardless of whether Pollock actually suffered physical injury. (See *Felix, supra,* 108 Cal.App.4th at pp. 1000–1001 [offense was inherently dangerous regardless of lack of extreme violence].)

Defendant was not a passive participant in the crime. Much like the defendant in *Felix,* he was the leader of the operation. His conduct was not a spontaneous reaction to an interaction with the victim. He knew that his friends had suggested robbing Pollock. And, as the trial court pointed out at sentencing, defendant consistently denied responsibility for the crime and showed no remorse for his actions. Although defendant had no prior criminal history, that fact is hardly determinative, as the court observed in *Felix.* (*Felix, supra,* 108 Cal.App.4th at p. 1001.) The lack of a criminal record takes on considerably less significance in view of the fact that defendant was engaged in three separate criminal offenses at the time of his arrest, including a marijuana trafficking operation. And, unlike the defendant in *Felix,* he was an adult in his mid-20's when he committed the offense.

Defendant relies primarily upon *Taylor, supra,* 93 Cal.App.4th at pages 323 to 324, in which the appellate court considered whether the mandatory nature of the 10-year consecutive term for firearm use under section 12022.53, subdivision (b) constitutes cruel and unusual punishment. The court in *Taylor* rejected the constitutional claim, reasoning that the defendant had an extensive criminal history and had just shot a friend of the victim before turning to the victim of the attempted robbery that was associated with the firearm use enhancement. (*Taylor, supra,* at p. 324.) The court did not suggest that the penalty would have been unwarranted if the defendant had not fired the gun or had no criminal history. It simply pointed out that the case was not close. While the offense here may have been less aggravated than in *Taylor,* the 10-year enhancement for use of a firearm may nonetheless survive constitutional scrutiny, as evidenced by *Felix,* even if the offense did not involve extreme violence or the defendant had no prior criminal history.

Under the circumstances, defendant has not met his considerable burden to establish that the punishment for his use of a firearm is grossly disproportionate to the nature of the offense.

## DISPOSITION

The judgment is affirmed.

_____
Pollak, Acting P. J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.