Filed 4/6/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>CASEY TURNER,<br><br>　　　　Defendant and Appellant.<br><br>_____<br><br>In re CASEY TURNER,<br><br>　　　　On Habeas Corpus. | A138649, A142829<br><br>(Alameda County<br>Super. Ct. No. 169011) |

## I. INTRODUCTION

A jury convicted Casey Turner of one count of second degree murder (Pen. Code,[1] § 187, subd. (a)), and two counts of attempted murder (§§ 187, subd. (a), 664). The jury also found true the allegations that Turner, who was 15 years old at the time of the offenses, personally used a firearm (§§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 1203.075). The court sentenced Turner to an aggregate state prison term of 84 years, 7 months to life.

On appeal, Turner contends the trial court prejudicially erred in refusing to instruct the jury on the theories imperfect self-defense and justifiable homicide based on self-defense. He also claims his right to due process was violated by giving the instructions on a kill zone theory that was not supported by substantial evidence. Additionally, Turner contends that his sentence of 84 years to life constitutes cruel and unusual

---

[1] All further undesignated statutory references are to the Penal Code.

punishment under the Eighth Amendment to the United States Constitution. In a related habeas corpus petition, which we have consolidated with this appeal, Turner claims he was denied effective assistance of counsel because his trial counsel failed to raise the issue of cruel and unusual punishment below and failed to present readily available mitigating evidence in support of a lesser sentence. Finally, Turner contends, and the Attorney General concedes, that the trial court erroneously concluded that it lacked discretion to waive the $200 probation investigation fee.

## II. EVIDENCE AT TRIAL

On March 27, 2010, 15-year-old Turner fired a gun at a group of young men, killing James Allen, and grazing Damonte Starks, and Burnett Raven. Turner knew the victims from high school. The incident took place in or near the parking lot of a local community market in downtown Oakland.

Some time prior to the shootings, Turner and Allen had gotten into a fight at school over a girl named Shay. Shay claimed that she was pregnant with Allen's child. However, according to Raven, Turner was telling people that Shay was "his woman." On the day of the shootings, Allen and several others, including his uncle or cousin Vito, Raven,[2] and Starks, had gotten together to make music at a friend's home recording studio. At some point, the group set out to find Turner to confront him about his involvement with Allen's "baby mama." Starks was with the group, but insisted that he had not left with them to "find" or to "hurt" Turner. According to Starks, the group took a bus to an area near 90th Avenue and Bancroft, where they planned to "go mess with some girls."

Starks and Raven told the police that the group got off the bus and walked over to two apartment complexes located between 92nd Avenue and 90th Avenue. Across the street from the 90th Avenue side, was the Rowaid Market, also known as the "blue"

---

[2] Raven was unavailable to testify at trial due to an unrelated gunshot wound that had left him unconscious with dim prospects of surviving. (Evid. Code, § 1291.) A video recording of his interview with the police was played and introduced into evidence. A transcript of the interview is included in the record on appeal. Additionally, Raven's preliminary hearing testimony was read into evidence.

market, which had an adjacent parking lot.  The group entered through a gate on the 92nd Avenue side of the complexes and followed the walkway that ran between the complexes to the 90th Avenue side.  As they approached the 90th Avenue gate, Starks heard gunshots and started running back along the walkway.  It sounded like the shots were coming from across the street at the blue market.  He began to run because he was afraid of being shot and killed.  At some point, he heard a bullet hit the gate.  As he ran, Starks was "grazed" by a bullet.  He felt the impact of the bullet and almost fell, but he kept running.  Starks ran up 92nd Avenue and got on a bus.  Later, he checked his clothing and found entry and exit holes in the upper left shoulder area of his hooded sweatshirt.

Starks remembered speaking to the police a couple of months after the shootings.  He did not recall telling the police he had seen two individuals across the street just before the shooting began.  Starks did not have a gun with him that day, and he did not see Allen with a gun.  He remembered that as he was running away, he heard some shots that sounded "a little bit closer," but he did not know from where the shots were coming.

Raven denied that he left with the group to go to the 90th Avenue apartments.  He claimed that he lied in his recorded police interview when he said that he and the group left together bound for the 90th Avenue apartments.  Rather, Raven claimed that he arrived alone at the 90th Avenue apartments.  He said he spent approximately 90 minutes to two hours with a girl (whose name he could not recall and who he had not seen since), and then left the building on the 90th Avenue side.  Upon leaving the building, he saw Allen and the rest of the group he had been with earlier that day.  On the witness stand, Raven denied that any words were exchanged among any members of the group when he first saw them on 90th Avenue.  However, during his recorded police interview, Raven said: "James [Allen] and [Vito] was on the phone.  Yeah, it was kind of, like, you could tell, like, they was getting into it.  And they was, like, James [Allen] was like, he was about to kill Casey [Turner] 'cause Casey was messing with his baby mama.  [Vito] was, like, 'Let's do it.'  And then, I was–we was walking–I was walking out the gate, so–we could get back on the bus.  So when I walked out the gate . . . Markus and Casey was

3

walking toward us from across the street."[3]  In his police interview, Raven also said that, while he and the group were inside the apartment complex, he heard someone say, "I'm gonna kill Casey."

Raven saw Turner across the street in the parking lot of the blue market.  Raven noticed that Turner was tying the hood of his jacket while holding a gun in his hand.  In his recorded police interview, Raven said: "I seen Casey [Turner] throw his hood on, tie it up.  And I was, like, 'There go Casey right there.'  And then right after that, Casey started shooting."  Raven later did not recall making this statement at the scene or during his police interview.  He explained that he was under the influence of marijuana at the time of his interview with the police.

Raven testified that as he reached the 90th Avenue gate, Allen was right behind him.  Turner pointed the gun at Raven and started shooting.  Raven ran back inside the gate.  Allen ducked and tried to cover himself as he ran back inside the gate.  Raven said Turner fired seven or eight shots.  Raven "heard different guns" being shot.  Raven did not know what Allen was doing at this point because Raven was too worried about getting out of the area.  Raven did hear two or three gunshots coming from a direction closer to him.  Although Raven testified that he did not know that Allen had a gun with him and he did not see him with a gun until after he saw him fall down, Raven initially told police that he saw Allen fire three shots from a chrome revolver.  Raven insisted, however, that Turner fired first.

As Raven and Allen were running, Allen collapsed.  Raven saw blood on Allen's shirt.  Later, Raven realized that he had been grazed by a bullet as there was a hole in his hooded sweatshirt and his back was stinging.

Rickeisha Glenn lived in one of the apartment complexes between 90th Avenue and 92nd Avenue.  Around 2:00 p.m. on the day of the shootings, Glenn heard what sounded like fireworks coming from the 90th Avenue side of the complex; she also heard the sound of running.  When she looked outside, she saw a person lying on the ground.

---

[3]     In his statement to the police, Raven said Turner had been with someone named "Markus."

When she went to check on the person, she saw blood coming from his mouth and he was unresponsive. She looked up and down the walkway that ran between the complexes. She saw three black males running through the 92nd Avenue gate. Glenn saw Turner running away from the 90th Avenue gate. Glenn knew Turner and saw him in the area on a regular basis. She said boys in the area frequently ran around recklessly with guns, acting if they were playing a game. Turner was one of those boys. Glenn later identified Turner in a photographic lineup.

Officer Patrick Mahanay of the Oakland Police Department participated in the investigation of the shootings. He recovered eight .25 caliber shell casings from the parking lot next to the blue market. The casings were found approximately 120 feet from the gate of the apartment complexes across the street. He found a nine millimeter shell casing in front of apartment 11, which was located across the street from the blue market. He also found a bullet hole in the exterior façade of apartment 11. Officer Mahanay found two strike marks on a wall next to the front door of a residence, which was consistent with shots being fired from inside the courtyard toward the market. He also documented a bullet hole that went through the wall of an apartment. The bullet penetrated another wall and could not be extracted. After officers finished searching the courtyard near the apartment with the bullet hole, a scratched and bent .380 caliber casing was discovered on the scene. Officer Mahanay thought this discovery was odd because the casing had not been previously found and it appeared to be old.

The parties stipulated that Allen died of a gunshot wound to the torso. The bullet entered the left front chest, passed through his heart, and was recovered on the left side of his back.

No firearm was ever recovered. The casings and bullets that were recovered from the scene were analyzed by criminalist Todd Weller of the Oakland Police Department. He examined ten shell casings and two bullets. Weller's analysis of the eight .25 caliber casings suggested that they were all fired from the same gun. Weller did not have a firearm that he could use to perform an eject pattern testing, which prevented him from opining as to the specific weapon used. For the other two casings, one a nine millimeter

5

Luger casing and the other a .380 caliber casing, Weller had nothing with which to compare them. Both bullets he analyzed were .25 caliber, which he concluded were fired from the same, unknown gun. Weller was unable to determine whether the .25 caliber bullets came from the .25 caliber casings. He further explained that a .25 caliber cartridge could be fired by a non-automatic handgun.

Sergeant Sean Fleming interviewed Starks in January 2011. In this interview, Starks told Sergeant Fleming that Raven, who also went by the name of Bigs, as well as Vito, Vontay, Zay, and Skrilla, were present at the time Allen was shot. Starks said the shooting started from across the street, near the blue market, where he saw two individuals standing. Starks thought Allen had fired back about three times. Starks identified Turner in a photographic lineup.

Also in January 2011, Sergeant Fleming interviewed Raven. Raven said that Starks, also known as Little Bigs, Zay, Vontay, and Vito were with him at the time of the shootings. Zay, Vontay, and Vito declined to cooperate with the police. Raven told Sergeant Fleming that Turner started shooting first from the parking lot across the street, as Raven and the others were leaving the 90th Avenue gate. Raven said "everything was, like, unexpected, kind of." Allen started shooting back from behind the gate, firing his gun three times. During the exchange of gunfire, a bullet grazed Raven's back. Raven told Sergeant Fleming that he was unaware that Allen had a gun with him that day; he did not see Allen's gun, a chrome revolver, until after the shooting started. Raven reported that he had seen Allen and Turner at a mutual friend's house, just a day before the shootings, and thought they were getting along. Raven said there were "no problems at all" between Turner and Allen. Raven did not realize until they were walking through the apartment complex that Allen intended to confront Turner about the girl who said she was pregnant with Allen's child, but who Turner said was his girlfriend.

### III. DISCUSSION

#### A.    *Self-Defense Instructions*

Turner contends the court prejudicially erred in refusing to instruct the jury on the theories of imperfect self-defense and justifiable homicide based on self-defense.

Defense counsel asked the court to instruct the jury with, among other things, CALJIC Nos. 5.12 (justifiable homicide–lawful self-defense) and 5.17 (actual but unreasonable belief in need to defend self).

Turner maintains the evidence justified the self-defense instructions because it showed Allen "accompanied by five friends and armed with a revolver—set out to confront [Turner], over a dispute as to whether [Allen] or [Turner] was the father of a baby on the way." He further claims that "[j]ust before the shooting, [Allen], in an agitated state, spoke of killing [Turner]."

CALJIC No. 5.12 addressing justifiable homicide based on perfect self-defense, states: "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes: [¶] 1. That there is imminent danger that the other person will either kill [him] [her] or cause [him] [her] great bodily injury; and [¶] 2. That it is necessary under the circumstances for [him] [her] to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to [himself] [herself]. [¶] A bare fear of death or great bodily injury is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone. The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm."

And, CALJIC No. 5.17, regarding imperfect self-defense provides as follows: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter. [¶] As used in this instruction, an

7

'imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. [¶] [However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]"

The trial judge refused to give the requested instructions, ruling that "[t]here is no substantial evidence to support" such instructions. Although the court denied Turner's request to include the self-defense instructions, defense counsel suggested during closing argument that Turner acted in self-defense because Allen threatened to kill Turner. Because we conclude the defense presented no evidence to support the giving of the requested instructions, Turner's claim fails.

Addressing a similar claim of instructional error, the California Supreme Court explained: "An unlawful killing involving either an intent to kill or a conscious disregard for life constitutes voluntary manslaughter, rather than murder, when the defendant acts upon an actual but unreasonable belief in the need for self-defense. [Citations.] In addition, a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend. [Citations.] In either case, 'the fear must be of imminent harm. "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." ' [Citations.] The trial court need not give [perfect or imperfect self-defense] instructions on request absent substantial evidence to support them." (*People v. Stitely* (2005) 35 Cal.4th 514, 550; see *People v. Manriquez* (2005) 37 Cal.4th 547, 581; *In re Christian S.* (1994) 7 Cal.4th 768, 783.) Where there is no evidence from which a jury could reasonably conclude a defendant had an actual or honest belief in the need to defend against imminent danger to himself or others, such instructions are properly refused. (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 162 [instructions on imperfect self-defense required where the evidence that the defendant was guilty only of that lesser offense is " 'substantial enough to merit [a jury's]

8

consideration' "; the existence of any evidence, no matter how weak, will not justify instructions on a lesser included offense]; *People v. Barton* (1995) 12 Cal.4th 186, 201 [sua sponte instruction that defendant killed in unreasonable self-defense is not required when the evidence is " 'minimal and insubstantial' "].) On appeal, we apply a de novo standard of review. (*Manriquez, supra*, 37 Cal.4th at p. 581.)

Here, the evidence was insufficient to require the giving of either self-defense instruction. The record is devoid of evidence suggesting Turner shot Allen because he *actually* believed he was in *imminent* danger of being killed or seriously injured. At some time prior to the shootings, Turner and Allen had fought about which one of them had impregnated a girl from school. However, the day just before the shootings, it was reported that there were "no problems at all" between Turner and Allen. On the day of the shootings, it was reported that the altercation unfolded in an "unexpected" manner. Turner shot first and then Allen returned fire.

Turner maintains there was substantial evidence to give the requested instructions because just prior to the shootings, Allen, "in an agitated state, spoke of killing [Turner]." Next, Raven called out, " 'There go [Turner] right there.' " According to Raven, " 'right after that, [Turner] started shooting.' "

Turner concedes that his failure to testify "complicates" the question of whether he heard Allen's "statement of homicidal intent" or Raven's subsequent declaration that Turner was across the street. Nevertheless, he insists that "there was a plausible basis for the jury to conclude [Turner] did hear one or both of these statements, that he saw the group of six boys assembled across the street from him, that he knew [Allen] was looking to confront him, and that he saw [Raven] point him out to the group." We disagree.

There is simply no basis for the jury to conclude that Turner heard the remarks by Allen and Vito. Raven said the comments were made *inside* the apartment complex, not outside. Moreover, Officer Mahanay testified that the .25 caliber shell casings he collected were located 120 feet from the 90th Avenue Gate. Also, there is no evidence that Turner saw a group of six boys assembled across the street from him. Raven testified that Turner started shooting at him as soon as he left the 90th Avenue gate.

9

Allen was directly behind Raven; both boys turned back and started to run back through the gate once the shooting started. Similarly, Starks started to run back down the walkway as soon as he heard the shooting. No evidence suggested that anyone other than Raven and Allen even stepped out of the gate; there was also no evidence that a group had assembled on the street in a "threatening manner."

Given the state of the evidence, in which nothing suggests Allen posed an imminent danger to Turner's life or that he created an imminent risk of inflicting great bodily harm to Turner, and there is no evidence from which the jury can infer that to be the case. Because the subjective elements required for imperfect self-defense are lacking, we conclude that the trial court correctly refused to instruct the jury on self-defense.

## B.    *Kill Zone Instruction*

Turner argues that insufficient evidence supported the trial court's instruction on attempted murder based on a kill zone theory. According to Turner, the record lacks substantial evidence that he specifically intended to kill Starks and Raven. Rather, he contends that he "merely acted with a conscious disregard for their lives." And, as such, the kill zone instruction impermissibly created an exception to the requirement that a specific intent to kill must be established in all attempted murder cases.

The trial court instructed the jury with CALJIC No. 8.66.1, which provides as follows: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim either as a primary target or as someone within the kill zone or zone of risk is an issue to be decided by you."

Preliminarily, the Attorney General argues that Turner has forfeited this issue by not objecting below to the kill zone instruction. Electing to circumvent Turner's ineffective assistance of counsel claim raised in his related petition for writ of habeas

10

corpus, we exercise our discretion (see *In re Sheena K.* (2007) 40 Cal.4th 875, 887) and review this otherwise forfeited claim, and conclude that it fails on the merits.

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.]  We review the trial court's decision de novo.  In so doing, . . . we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt" that Turner committed attempted murder based on a kill zone theory.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1206; § 1093.)  That determination must be made without reference to the credibility of the evidence.  (*People v. Marshall* (1996) 13 Cal.4th 799, 847.)

We first consider the mental state required for attempted murder, which "has long differed from that required for murder itself.  Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*).)  " 'In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  "The mental state required for *attempted* murder is further distinguished from the mental state required for murder in that the doctrine of 'transferred intent' applies to murder but not attempted murder." (*Id.* at pp. 739-740.)  "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another.  The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*Bland, supra,* 28 Cal.4th at p. 317.)  In contrast, " '[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' " (*People v. Smith, supra,* 37 Cal.4th at p. 740.)

Under a concurrent intent or kill zone theory, however, a defendant may be guilty of the attempted murder of victims who were not the defendant's primary target but were located within the kill zone.  (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798.) This occurs " 'when the nature and scope of the attack, while directed at a primary

11

victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.' " (*Bland, supra,* 28 Cal.4th at pp. 329-330.) "In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die." (*People v. McCloud, supra,* 211 Cal.App.4th at p. 798.) A rational jury may infer this specific intent "from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm." (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.)

Substantial evidence supports the trial court's instruction on attempted murder based on a kill zone theory. Allen, Starks, and Raven walked through a corridor between two apartment complexes. As Raven, approached the 90th Avenue gate ahead of Allen, Turner, positioned across the street, aimed a gun at Raven and started shooting. A bullet grazed Raven as he turned and ran back inside the gate. Allen also turned and ran back inside as Turner continued shooting. Starks, who was farther back, also turned to flee as the shooting began. As he ran, a bullet grazed Starks. In all, Turner fired at least eight shots into the corridor, which hit three people. From this evidence, the jury could draw a reasonable inference, in light of the direction of the shots and the number of shots, that Turner harbored a specific intent to kill every living being in the corridor. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 563-564 [finding the jury "drew a reasonable inference, in light of the placement of the shots, the number of shots and the use of high-powered,

12

wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences" at which they shot].)

Turner, nevertheless, disputes the propriety of the kill zone theory, arguing that, as to Allen's death, the prosecutor asked the jury to convict him of second degree murder on an implied malice theory. He posits that "if the 'kill zone' theory of attempted murder is rooted in the notion of *concurrent* intent, and [he] did not harbor the specific intent to kill [Allen] (but rather shot him with a conscious disregard for life), then he also did not harbor the specific [intent] to kill [Starks] or [Raven], whom the prosecution never claimed (and the evidence did not show) were the shooter's primary targets." Rather, he asserts that the evidence shows only that he shot at Allen, Starks, and Raven in a manner that subjected all three of them to the risk of fatal injury with conscious disregard. According to Turner, the kill zone instruction was inapplicable because there is no evidence he specifically intended to kill *anyone*. By this argument, Turner essentially disputes the existence of a primary target. In *People v. Stone* (2009) 46 Cal.4th 131, 140 (*Stone*), however, our Supreme Court explained that "[a]n indiscriminate would-be killer is just as culpable as one who targets a specific person." "Although a primary target often exists and can be identified, one is not required." (*Ibid.*) " '[G]uilt of attempted murder must be judged separately as to each alleged victim.' [Citation.] But this is true whether the alleged victim was particularly targeted or randomly chosen." (*Id.* at p. 141.)

Turner acknowledges the holding in *Stone*, but argues it is not dispositive since nothing suggests a person may be convicted of attempted murder when there is no primary target *and* no specific intent to kill. He further contends that where there is no primary target, *Stone* requires a specific intent to kill *everyone* in the "kill zone," such that it is of little consequence that there is no specific intent to kill a particular person. Even assuming *arguendo*, that this interpretation of *Stone* is valid, Turner's claims, nevertheless, fail. Here, although the prosecutor asked the jury to convict Turner of second degree murder on an implied malice theory, when discussing the attempted murder counts, the prosecutor referred to evidence indicating that Turner acted with "a definite and unambiguous intent to kill" as he shot at Allen, Starks, and Burnett.

13

Specifically, the prosecutor stated: "[W]e know from the witnesses that when the shots rang out, they started running down the corridor to get away. We know that James Allen was struck in the chest. We know that Damonte Starks and Burnett Raven were essentially grazed . . . . That's how close the bullets are flying in this constricted area as these young people are running down the [corridor]. It's not one shot, not two shots, not three shots. It's far more than that. [¶] A direct step indicates a definite and unambiguous intent to kill. Shooting at close range at a crowd of people who have almost no means of escape, you're running down a corridor and you're just praying the bullets miss as they're flying by." We agree that the totality of the evidence suggests that Turner specifically intended to kill Allen, Starks, and Raven, but the jury convicted defendant of second degree murder on an "implied malice" theory.

Turner next argues that the jury was confused by the prosecutor's argument because it asked for clarification of the definition of the mental state for attempted murder. Citing CALJIC No. 8.66.1, the trial court responded that a defendant must have a "specific intent to kill another human being and anyone else in the 'zone of risk.' " Less than a half hour later, the jury returned its verdicts.

In sum, we conclude the trial correctly instructed the jury with CALJIC No. 8.66.1 on the kill zone theory. Substantial evidence supports Turner's attempted murder convictions under that theory.

## C.     *Cruel and Unusual Punishment Under the Eighth Amendment*

Relying on *Miller v. Alabama* (2012) 567 U.S. ___, 132 S.Ct. 2455, 183 L.Ed.2d 407 (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), Turner argues his 84 years to life sentence constitutes a de facto life sentence because he was a juvenile offender who will not be eligible for parole until he is 99 years old–an age outside his natural life expectancy. He further claims on direct appeal and in his consolidated petition for writ of habeas corpus that his defense counsel rendered ineffective assistance by failing to object to the sentencing and by failing to offer readily available mitigating evidence.

14

The Attorney General asserts that Turner forfeited the challenge to his sentence because he failed to object in the trial court. The Attorney General further adds that Senate Bill 260 (Sen. Bill 260) cures any defect in Turner's sentence, and thus defense counsel was not ineffective for failing to object to the sentence imposed.

1. *Turner's Sentence of 84 Year to Life Affording Him an Initial Parole Hearing at Age 99 Violates the Eighth Amendment*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." (See also Cal. Const., art. I, § 17 [proscribing the infliction of "cruel or unusual punishment"].) This restriction proscribes punishment that it is grossly disproportionate to the offender's culpability. (U.S. Const., 8th Amend.) In the context of juvenile offenders, because they "cannot with reliability be classified among the worst offenders," categorical rules have developed to prevent the imposition of disproportionate punishment. (*Roper v. Simmons* (2005) 543 U.S. 551, 569.)

In *Graham, supra,* 560 U.S. 48, the Supreme Court held a nonhomicide juvenile offender may not be sentenced to life without parole (hereafter LWOP). (*Id.* at p. 74.) The Court required juvenile offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" absent exceptional circumstances. (*Id.* at p. 75.)

After *Graham* came *Miller, supra,* 567 U.S. __ [132 S.Ct. 2455], in which the high court prohibited sentencing a juvenile homicide offender to mandatory LWOP and required the sentencing court to consider the mitigating qualities of youth, including: (1) age and its hallmark features such as immaturity, impetuosity, and failure to appreciate risk and consequences; (2) family and home environment; and (3) circumstances of the homicide offense, including the extent of participation and familial or peer pressure. (*Id.* at pp. 2467-2468, 2475.)

Following *Graham* and *Miller,* in *Caballero, supra,* 55 Cal.4th 262, the California Supreme Court prohibited a term-of-years sentence that amounts to the "functional equivalent" of LWOP for juvenile nonhomicide offenders. (*Caballero, supra,* 55 Cal.4th at pp. 267-268.) The court explained the Eighth Amendment requires that at sentencing,

15

a juvenile nonhomicide offender must be provided with "a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future," and "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development." (*Id.* at pp. 268-269.)

In developing these rules, the courts relied on three fundamental differences between juveniles and adults to conclude juveniles are constitutionally different from adults for sentencing purposes. (*Graham, supra,* 560 U.S. at p. 68.) First, as compared to adults, "children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller, supra,* 567 U.S. __ [132 S.Ct. at p. 2464].)

Because of these characteristics, " 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.' " (*Graham, supra,* 560 U.S. 48, 68.) Yet, "a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Id.* at p. 70.) Accordingly, "appropriate occasions for sentencing juveniles to [LWOP or its functional equivalent] will be uncommon." (*Miller, supra,* 567 U.S. __ [132 S.Ct. at p. 2469].)

In the wake of these cases, "[t]he issue of how long someone under the age of 18 may be sentenced to prison has been the subject of considerable judicial attention." (*People v. Perez* (2013) 214 Cal.App.4th 49, 55.) A long sentence with eligibility for parole will be constitutional "*if* there is some meaningful life expectancy left when the

16

offender becomes eligible for parole." (*Id.* at p. 57 [no case has struck "down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole"] (Fn. omitted.).) How much life expectancy must remain at the time of parole eligibility remains unclear. (See *People v. Solis* (2014) 224 Cal.App.4th 727, 733, review granted June 11, 2014, S218757 [sentence allowing for parole eligibility at age 68 constituted the functional equivalent of LWOP]; *People v. Perez, supra,* 214 Cal.App.4th at pp. 57-58 [sentence allowing for parole eligibility at age 47 did not constitute the functional equivalent of LWOP].)

It is undisputed that Turner committed the crimes when he was 15 years old and under his sentence, he would first become eligible for parole at the age of 99. Turner argues his sentence offers him no realistic opportunity for release during his lifetime. He contends that, considering the reduced life expectancy that results from incarceration, he will have no meaningful chance at life after parole before he reaches his life expectancy, assuming he even survives long enough to reach his first parole eligibility date. (See *People v. Solis, supra,* 224 Cal.App.4th at p. 734.)

"[L]ife expectancy projections derived on appeal [have varied] widely in recent juvenile LWOP cases," from as high as 80 years for an 18–year–old defendant to as low as 64.6 years for a 17–year–old defendant. (See *People v. Gonzalez* (2014) 225 Cal.App.4th 1296, 1307, review granted July 23, 2014, S219167; *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [life expectancy for an 18–year–old male is 76 years] [citing National Center for Health Statistics, Centers for Disease Control, National Vital Statistics Reps. (June 28, 2010) table 2, vol. 58, No. 21, and *People v. Romero* (2002) 99 Cal.App.4th 1418, 1427–1428]; *People v. Solis, supra,* 224 Cal.App.4th at p. 734, fn. 2 [life expectancy for a 17–year–old is 72 years based on actuarial tables].)

Even assuming a high range life expectancy of 80, Turner's initial parole hearing at age 99 is unquestionably too late to ensure a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham, supra,* 560 U.S. at p. 75.) Turner's sentence offering him his first chance at parole just shy of his 100th birthday

17

affords him little opportunity to become a contributing member of society. Rather, it constitutes an impermissible judgment on his value and place in society that deprives him of a meaningful opportunity to demonstrate his rehabilitation and fitness to reenter society in the future. (*Id.* at p. 74; *Caballero, supra,* 55 Cal.4th at p. 268.) Turner's sentence therefore conflicts with the mandate of *Graham, Miller,* and *Caballero* that absent exceptional circumstances, juvenile offenders must be afforded a realistic possibility of life outside of prison as a reformed individual. "Although proper authorities may later determine that [Turner] should remain incarcerated for [his] natural [life]," standing alone Turner's sentence of 84 years to life constitutes the functional equivalent of LWOP in violation of the Eighth Amendment. (*Caballero, supra,* 55 Cal.4th at p. 268.)

  2.  *Section 3051 Cures the Constitutional Violation*

  Although we conclude Turner's sentence violates the Eighth Amendment, recently enacted section 3051 cures this constitutional deficiency. In response to *Graham, Miller,* and *Caballero,* the Legislature enacted Senate Bill No. 260 to establish section 3051 addressing juvenile sentencing concerns, effective January 1, 2016.

  Section 1 of Senate Bill 260 states in relevant part: "The Legislature finds and declares that, as stated by the United States Supreme Court in [*Miller*], 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United

18

States Supreme Court in [*Graham*] and [*Miller*]." (Legis. Counsel's Dig., Sen. Bill No. 260 (2013–2014 Reg. Sess.) § 1, pp. 2–3.) The Legislature declared its intent "to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (*Ibid.*)

Section 3051 provides in pertinent part that subject to inapplicable exceptions, "[a] person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 20th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subds. (b)(3), (h).) "The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release" and "take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (§ 3051, subds. (e), (f)(1).)

California Courts of Appeal disagree as to the effect of section 3051 on sentences in violation of the Eighth Amendment. However, the majority of cases addressing the issue conclude section 3051 cures any constitutional violation. (See *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652; *People v. Martin* (2013) 222 Cal.App.4th 98, review granted Mar. 26, 2014, S216139; *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699; *People v. Gonzalez, supra,* 225 Cal.App.4th 1296, review granted July 23, 2014, S219167; *People v. Saetern* (2014) 227 Cal.App.4th 1456, review granted Oct. 1, 2014, S220790; *People v. Garcia* (2015) 240 Cal.App.4th 1282, review granted Jan. 13, 2016, S230616.)

In comparison , only a handful of cases conclude section 3051 fails to ameliorate any constitutional deficiency in sentencing. (See *In re Heard* (2014) 223 Cal.App.4th 115, review granted Apr. 30, 2014, S216772; *In re Rainey* (2014) 224 Cal.App.4th 280, review granted June 11, 2014, S217567 [approving of *In re Heard, supra,* 223 Cal.App.4th 115 in dicta]; *People v. Solis, supra,* 224 Cal.App.4th 727, review granted

19

June 11, 2014, S218757; *People v. Garrett* (2014) 227 Cal.App.4th 675, review granted Sep. 24, 2014, S220271).  Currently pending before the California Supreme Court is the issue of whether section 3051, which provides that the hearing to consider the above factors will take place no later than 25 years into a youth offender's sentence, satisfies the concerns set forth in *Graham, Miller,* and *Caballero* that the factors be considered as part of the original proceedings.

In *In re Alatriste, supra,* 220 Cal.App.4th 1232, the court reasoned that "*Graham, Miller* and *Caballero* merely hold that a juvenile defendant may not be incarcerated for life or its functional equivalent without some meaningful opportunity for release on parole during his or her lifetime.  These cases do not require that the time when that meaningful opportunity might occur should be determined at the time of sentencing." (*Id.* at p. 1240.)  The new procedure under section 3051 therefore provides juveniles with the requisite opportunity compelled by these judicial decisions by affording them a meaningful chance to obtain release based on demonstrated maturity and rehabilitation. (*In re Alatriste, supra,* 220 Cal.App.4th at p. 1240; accord, *People v. Martin, supra,* 222 Cal.App.4th 98.)

Similarly, in *People v. Franklin, supra,* 224 Cal.App.4th 296, our colleagues in Division Three of this judicial district concluded that "[w]hile an effective LWOP sentence imposed prior to the enactment of . . . section 3051 may have violated constitutional restrictions when rendered, the new section has provided the parole opportunity that was constitutionally lacking.  Without the recent legislation, defendant here arguably faced 'the functional equivalent of a life without parole sentence,' . . . triggering the need for the exercise of discretion under *Miller*.  However, with the new parole eligibility date provided by . . . section 3051, defendant's sentence is no longer the functional equivalent of an LWOP sentence and no further exercise of discretion at this time is necessary." (*Id.* at p. 306.)  In so holding, the court agreed with the court in *In re Alatriste, supra,* 220 Cal.App.4th 1232, that *Graham, Miller,* and *Caballero* do not require "the trial judge at the time of initial sentencing to make a determination as to when a particular juvenile offender should become eligible for parole consideration," and

noted the procedure under section 3051 allowed parole eligibility to be considered more intelligently and more fairly than if predicted at the time of sentencing. (*Franklin, supra,* 224 Cal.App.4th at p. 306; see *People v. Gonzalez, supra,* 225 Cal.App.4th at pp. 1310-1311 [application of section 3051, which makes the defendant eligible for parole at age 46, results in a sentence that does not constitute the functional equivalent of LWOP and therefore *Graham, Miller,* and *Caballero* do not apply].)

At the time of this writing, the only published case addressing section 3051, which is not subject to pending review by the California Supreme Court is *People v. Garcia* (Oct. 5, 2015, E059452) 240 Cal.App.4th 1282 (*Garcia*). In *Garcia,* the court held that a defendant's sentence of 32 years to life for crimes committed at age 15 did not violate the Eighth Amendment for two reasons. (*Id.* at p. 1290.) First, the defendant's 32-years-to-life sentence was not an actual or effective life sentence without the possibility of parole. (*Ibid.*) By its terms, the sentence allowed for the defendant to seek release at 47 years old, well within his life expectancy. (*Ibid.*) And second, "even for sentences that are actual or effective life sentences, which [Garcia's] emphatically is not, the recently enacted section 3051 guarantees defendant a youthful offender [a] parole hearing after 25 yeas, when a 15-year-old offender would be approximately 40 years old." (*Ibid.*) In so holding, the court reasoned that "section 3051 has in effect abolished de facto life sentences in California. Section 3051 universally provides each juvenile offender convicted as an adult with a mandatory parole eligibility hearing on a legislatively specified schedule, and after no more than 25 years in prison." (*Id.* at p. 1291.)

In contrast, the court in *In re Heard, supra,* 223 Cal.App.4th 115 disagreed with the conclusion of these opinions on the ground that it allowed the sentencing court to disregard its constitutional duty at sentencing to consider the differences between juveniles and adults established in *Graham, Miller,* and *Caballero.* (*In re Heard, supra,* 223 Cal.App.4th at pp. 130-131.) The court interpreted section 3051 as a " 'safety net' to guarantee a juvenile offender the opportunity for a parole hearing during his or her lifetime" that did not relieve the sentencing court of its duty to impose a constitutional sentence for a juvenile defendant. The court reasoned its conclusion was made "all the

21

more true because there is no guarantee that [section 3051] will remain in existence when [a defendant] would be eligible to benefit from it." (*In re Heard, supra,* 223 Cal.App.4th at pp. 130-131; see *People v. Garrett, supra,* 227 Cal.App.4th 675, 688-689 ["[t]he statutory promise to have a future parole board review an improperly considered sentence does not cure the constitutional error" because it cannot substitute for the sentencing court's required consideration of the factors of youth and maturity at the time of sentencing].)

Likewise, in *People v. Solis, supra,* 224 Cal.App.4th 727, the court agreed with *In re Heard* that section 3051 should act as "a ' "safety net" ' " rather than a "cure-all" for juvenile sentences that violate the Eighth Amendment, for fear that trial courts may forgo applying the principles of *Graham, Miller,* and *Caballero.* (*People v. Solis, supra,* 224 Cal.App.4th at p. 736.) The court then determined that because the defendant's juvenile characteristics were considered at the sentencing hearing, it could cure any constitutional defect by modifying the sentence to reflect the defendant was entitled to a parole hearing after serving 25 years in prison. (*Id.* at pp. 736-737.)

Pending a ruling from our supreme court, we conclude that section 3051 as applied to Turner's sentence satisfies the constitutional mandates articulated in *Graham, Miller,* and *Caballero.* These judicial decisions articulate that given the differences between juveniles and adults, juveniles are less deserving of the worst punishments. (*Graham, supra,* 560 U.S. at p. 68.) Accordingly, in considering a juvenile's sentence, the sentencing court must take into account the characteristics of youth that may mitigate the justifications for imposing the harshest penalties. (*Miller, supra,* 567 U.S. ___ [132 S.Ct. at p. 2468].) Absent exceptional circumstances, a sentence will be overly harsh, and thus constitute cruel and unusual punishment, when it acts as the functional equivalent to LWOP by affording no meaningful opportunity for parole within the juvenile's life expectancy. (*Caballero, supra,* 55 Cal.4th at pp. 268-269.)

Under section 3051, Turner will receive a parole hearing in his 25th year of incarceration, at the age of 40. At his parole hearing, the Board of Parole Hearings will "take into consideration the diminished culpability of juveniles as compared to that of

adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual" in considering Turner's release. (§ 3051, subds. (e), (f)(1).) Section 3051 thus provides Turner with a meaningful opportunity to obtain release based on demonstrated growth and rehabilitation by affording him his first parole hearing well within his life expectancy. Like the court in *Franklin, supra,* 224 Cal.App.4th at pages 306-307, "[w]e believe that the procedure adopted in . . . section 3051 is preferable to the determination of parole eligibility dates for juvenile offenders when they are sentenced. The underlying rationale for constitutionally requiring that juvenile offenders be afforded an opportunity for meaningful parole is that many will outgrow the youthful characteristics responsible for their criminal conduct and with maturity become capable of leading constructive and law-abiding lives. (*Miller, supra,* 567 U.S. at pp.____, [132 S.Ct. at pp. 2464-2465].) Whether a particular juvenile acquires the maturity and insight to justify parole certainly can be determined more intelligently and more fairly with the passage of time, rather than by a prediction at the time of sentencing. The statute provides predictability for most juvenile offenders and relieves trial judges of the great uncertainty inherent in setting an alternative parole eligibility date. (See *Caballero, supra,* 55 Cal.4th at pp. 268-269, [declining to provide trial courts with a precise timeframe for setting future parole hearings but requiring sentencing courts to 'consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board'].)"

In section 3051, the Legislature has imposed a statutory time when a juvenile offender may seek release. This is precisely what the court in *Caballero, supra,* 55 Cal.4th at page 269, footnote 5, urged the Legislature to adopt: "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of

23

rehabilitation and maturity." In section 3051, the Legislature has gone further and created a mechanism applicable to most juvenile offenders, including those guilty of homicide crimes.

We therefore conclude that with enactment of section 3051 affording Turner the opportunity for a parole hearing in his 25th year of incarceration, Turner's sentence will satisfy the constitutional requirements of *Graham, Miller,* and *Caballero* because he will receive his first opportunity for parole well within his life expectancy. However, we must ensure a defendant receives a constitutional sentence *at the time of sentencing*. (See *Caballero, supra,* 55 Cal.4th at pp. 268-269.) Accordingly, out of an abundance of caution we will modify his sentence to include a minimum parole eligibility date of 25 years. We can thus conclude with certainty that Turner has been provided with a sentence that passes constitutional muster.

### 3. *Ineffective Assistance of Counsel Claim*

In his writ of habeas corpus petition, Turner asserts his counsel was ineffective because he failed to argue his sentence was unconstitutional under *Graham, Miller,* and *Caballero*, and did not present readily available mitigating evidence of youth and inexperience.

"Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 350-351.)

"A defendant claiming ineffective assistance of counsel must satisfy *Strickland's* [*Strickland v. Washington* (1984) 466 U.S. 668] two-part test requiring a showing of counsel's deficient performance and prejudice. [Citation.] As to deficient performance, a defendant 'must show that counsel's representation fell below an objective standard of reasonableness' measured against 'prevailing professional norms.' [Citation.] 'Judicial scrutiny of counsel's performance must be highly deferential,' a court must evaluate counsel's performance 'from counsel's perspective at the time' without [ ] 'the distorting effects of hindsight,' and 'a court must indulge a strong presumption that counsel's

24

conduct falls within the wide range of reasonable professional assistance . . . .' [Citation.]" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 75 (*Jacobs*).)

Even under these highly deferential standards, defense counsel's performance in connection with the sentencing was deficient. Defense counsel did not file a sentencing brief and submitted at the hearing without raising any objections to the probation report. It is also unclear whether defense counsel even reviewed the probation report with Turner. Most importantly, defense counsel did not assert any established California Constitution protections against grossly disproportionate cruel and unusual juvenile punishments discussed above. In essence, defense counsel did nothing to advocate on behalf of Turner regarding the sentencing in this case.

Of course, Turner must also demonstrate prejudice as a result. "The prejudice prong requires a defendant to establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Jacobs, supra,* 220 Cal.App.4th at p. 75.)

Turner argues that his case is "materially indistinguishable" from *People v. Speight* (2014) 227 Cal.App.4th 1229 (*Speight*), which held that a 17-year-old defendant was prejudiced by his attorney's failure to raise an Eighth Amendment objection to the length of the sentence imposed. (*Id.* at pp. 1233, 1248-1249.) Once again, section 3051 is relevant in our analysis of Turner's claim. *Speight* did not address the effect of section 3051 on the defendant's sentence or its application in assessing his claim of ineffective assistance of counsel. In fact, there is no mention in *Speight* of section 3051 or Senate Bill 260 at all. Accordingly, *Speight* is not dispositive of the issue on appeal.

Rather, we conclude that even if counsel had raised the challenge Turner now faults him for omitting, there is no possibility on the record presented on appeal he would have received in the trial court a sentence with an earlier parole eligibility date than under section 3051. Moreover, as Turner's sentence was not unconstitutional, it follows that his counsel was not ineffective for failing to argue that it was.

25

### D. *Probation Investigation Fee*

At Turner's sentencing hearing, the trial court imposed a probation investigation fee of $710. Defense counsel asked if the court would consider waiving the fee "in view of the sentence." The court responded that it lacked the authority to waive the fee under section 1203.1, but agreed to reduce the fee to $200.

Turner argues, and the Attorney General concedes, that the trial court erred by finding that it could not waive the probation investigation fee. Section 1203.1b, subdivision (a) "requires the probation officer to determine a defendant's ability to pay all, or a portion of the reasonable cost of probation supervision and probation report preparation. The statute also requires the probation officer to inform the defendant he has a right to have the court determine his ability to pay and the payment amount. The defendant may waive the right to such a determination only by a knowing and intelligent waiver. ([]§ 1203.1b, subd. (a).) Absent such a waiver, a court must conduct an evidentiary hearing. If the court determines the defendant is able to pay all or part of the costs, the court is required to set the amount of the payment and order the defendant to pay that amount to the county in a manner that is reasonable and compatible with the defendant's financial ability. ([]§ 1203.1b, subd. (b).) The statute also provides for additional hearings during the period of probation to review the defendant's ability to pay the probation costs. ([]§ 1203.1b, subd. (c).)" (*People v. Hall* (2002) 103 Cal.App.4th 889, 892-893.)

Although the probation officer recommended a $710 fee, there is no indication the probation officer determined Turner's ability to pay the fee. The probation officer noted that 18-year old Turner had never been employed and had no verifiable income. It is unclear whether Turner was informed of his statutory right under section 1203.1b to have the court determine his ability to pay the fee, as required. (*People v. Hall, supra,* 103 Cal.App.4th at p. 893.) Moreover, there is no indication Turner waived his rights to a court hearing and judicial determination. The court did not conduct a hearing or receive evidence regarding Turner's financial ability to pay the probation investigation fee. The court made no finding regarding Turner's ability to pay all or part of the probation fees.

26

As the court in *People v. Hall, supra,* 103 Cal.App.4th 889 explained, "section 1203.1b does not specify the procedure a trial court should follow if it determines a defendant is unable to pay any part of his probation costs. The *obvious implication* from the language of . . . section 1203.1b, subdivision (b)(2), however, *is that the court should not order the defendant to pay any portion of the costs. This conclusion follows from the following language: 'if the court determines that the defendant has the ability to pay all or part of the costs, the court shall set the amount to be reimbursed and order the defendant to pay that sum to the county . . . .' ([], § 1203.1b, subd. (b)(2).) If the court determines the defendant lacks the ability to pay any part of the costs, it cannot, consistent with section 1203.1b, subdivision (b)(2), order the defendant to reimburse the county for any costs.*" (*People v. Hall, supra,* 103 Cal.App.4th at pp. 893-894, italics added.)

Here, the court ordered Turner to reimburse the county for his probation investigation fee in the amount of $200. The court's order was no doubt well-intentioned, but nonetheless erroneous. The trial court's order requiring Turner to pay $200 is stricken.

## IV. DISPOSITION

Turner's sentence is modified to reflect he shall be entitled to a parole hearing after serving 25 years in prison. Additionally, the $200 probate investigation fee shall be

27

stricken.  The clerk of the trial court is directed to prepare a new abstract of judgment with these modifications and to send a certified copy thereof to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.  The petition for writ of habeas corpus is denied.


                                    _____

                                    REARDON, ACTING P. J.


We concur:


_____

RIVERA, J.


_____

STREETER, J.

Trial Court: Alameda County Superior Court


Trial Judge: Hon. Vernon K. Nakahara


Counsel for Appellant: Jonathan Soglin
Jeremy Price
First District Appellate Project


Counsel for Respondents: Kamala D. Harris
Attorney General
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Senior Assistant Attorney General
Rene A. Chacon
Supervising Deputy Attorney General
Joan Killeen
Deputy Attorney General


*People v. Turner, In re Turner* A138649, A142829