Filed 10/1/20  P. v. Wickersham CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B301276 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA094410) |
| v. | |
| KAMROM DANIELLE WICKERSHAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed.

Rudolph J. Alejo, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jaime L. Fuster and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kamron Danielle Wickersham was charged with attempted first degree murder for attacking her spouse with a knife. The jury acquitted her of that charge but convicted her of the lesser included offense of attempted involuntary manslaughter in violation of Penal Code[1] sections 192, subdivision (a)(1), and 664,[2] from which she now appeals.

Appellant argues we must reverse her conviction because the trial court's instructions on one of her two defenses—voluntary intoxication—was misleading. While the trial court properly instructed the jury that being voluntary intoxicated negates the specific intent required for attempted murder, it did not explicitly indicate that being voluntary intoxicated also negates the specific intent required for the lesser included offense of attempted voluntary manslaughter.

We affirm. There was no error in the trial court's instructions. Moreover, insofar as the jury was not better informed that voluntary intoxication is also a defense against the lesser included offense for which she was convicted, any such error would be harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

---

[1] Subsequent undesignated statutory citations are to the Penal Code.

[2] Kamron was also convicted of two counts of injuring a spouse, in violation of section 273.5, subdivision (a). She does not appeal these two convictions. The jury also found true two sentencing enhancements: that she personally used a deadly weapon, a knife, in connection with her conviction for attempted voluntary manslaughter in violation of section 12022, subdivision (b)(1); and that she personally inflicted great bodily injury upon a spouse, within the meaning of section 12022.7, subdivision (e). Kamron's brief does not appeal either enhancement.

# BACKGROUND AND PROCEDURAL HISTORY

## A.  Factual Background

Kamron met Jeffrey Wickersham in 1998 or 1999.[3]  She was 22 years old and delivered pizzas for Pizza Hut.  Jeffrey was 31 years old and worked as a programmer at CCH Wolters Kluwer. They met in the elevator at Jeffrey's office building when Kamron was delivering a pizza.  They began dating and had a sporadic relationship until getting married in 2013.

At some point early in their relationship Jeffrey began using methamphetamine.  He persuaded Kamron to try it.  Jeffrey eventually stopped taking the drug (it caused him mouth sores), and switched to Adderall, a prescription stimulant.  Jeffrey testified that Kamron did not stop using methamphetamine.

Their relationship of 15 years was at times violent and abusive.  Kamron relied on Jeffrey for food, shelter, and necessities. Jeffrey admitted that he was emotionally, physically, and verbally abusive towards Kamron.  He testified that he "needed to control the money supply."

Jeffrey admitted that he once headbutted Kamron and broke her nose while "getting up."  In Jeffrey's words, he "tripped." Jeffrey also admitted the two engaged in "scuffles."  He claimed these scuffles were "mutual" and involved "arguments, yelling, screaming, throwing things, grappling, pushing, some striking. Pretty much stuff like that."  When asked if he ever struck Kamron, Jeffrey testified he could not remember, but pointed out:  "It means

---

[3] Because they share the same last name, we use Kamron's and Jeffrey's first names for clarity and ease of reference and intend no disrespect.  (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1.)

I have no memory of [striking Kamron]. It doesn't mean it didn't happen."

On Valentine's Day of 2016, Kamron wanted to go out but Jeffrey was too tired and wanted to go to bed. Jeffrey was by then an engineer at Raytheon Corporation. But Kamron nevertheless put on a red dress and asked him to get ready to go out. Kamron kept the lights on in the bedroom and was using a small vanity to put on her makeup. Jeffrey first attempted to unplug the vanity so he could close the bedroom door and sleep. After they continued to fight, Jeffrey threw the mirror against the closet wall. While pushing and shoving each other, one of Jeffrey's fingers ended up in Kamron's mouth, and she bit it. Kamron swung at Jeffrey as well, striking him a few times with a closed fist and causing a black eye.

A few days later, on February 17, 2016, Jeffrey went to the Torrance police station and reported the assault because he "needed to start thinking about a divorce." But Jeffrey asked the police not to arrest Kamron.

The marriage had gotten to the point where neither Jeffrey nor Kamron was comfortable. They argued about Kamron being unemployed, going back to school, and not keeping the apartment clean.

The charged crimes in this case involved two different incidents.[4]

The first occurred on June 26, 2016. At 2:00 a.m. that morning, Kamron came home and told Jeffrey she was pregnant. Jeffrey knew it was someone else's baby because they had stopped intercourse some time before. Kamron asked Jeffrey for some money to pay for the cab that had just taken her home from the

_____

[4] The trial court granted the defense's motion for a judgment of acquittal involving a third incident.

4

hospital.  He refused and told her the marriage was over.  Kamron then put some hard drives into a bag and hit Jeffrey over the shoulder.  This assault was the basis for the charge in count 3.

The second incident occurred the following evening and involved the charges in counts 1 and 2.  Jeffrey came home around 4:30 or 5:00 p.m. that night after speaking with a divorce attorney.  He brought in two bags of groceries and noticed that Kamron was under the kitchen sink apparently attempting to repair a clog or the garbage disposal, which they had a problem with earlier.  Jeffrey stepped over Kamron's legs, and put the groceries away.  As he did this, he grew angry because Kamron had told him less than 24 hours earlier that she had become pregnant by another man.  He then noticed that Kamron was in fact "[t]aking apart and attempting to put together things," a behavior he had observed in Kamron when she was high on methamphetamine.  This made him even more angry, since she was pregnant and appeared to be using drugs.

Jeffrey took a bottle of beer from the groceries and began berating and belittling Kamron because he wanted to hurt her by making her feel bad.  He walked into the living room, stood there, and continued yelling insults for about 20 minutes.  Kamron then left the kitchen and charged at Jeffrey with her fist raised in the air, striking him with a knife.  Jeffrey raised his left hand to block Kamron, the two fell, and the knife went into his left wrist, causing the tip to break.

Jeffrey took the broken part of the knife blade out of his wrist and dropped it on the ground.  Kamron retrieved the broken knife and proceeded to strike him twice on the top of his head.  While she was hitting him, Jeffrey tried to push Kamron back so he could escape and leave the apartment.  Jeffrey eventually got up and tried to open the door, but had difficulty doing so.  Kamron

proceeded to pummel Jeffrey's head five times with the remainder of the knife consisting of its handle and a broken blade. As he struggled to open the door, Kamron struck Jeffrey in the shoulder with a different knife—a two-and-a-half-inch paring knife.

Jeffrey was finally able to open the apartment door and run as fast as he could across the apartment courtyard to the front of the apartment complex. A neighbor, Melissa Camberos, heard Jeffrey yell, "Help, help. My wife stabbed me," and called 911. Jeffrey collapsed in front of the apartment manager's apartment. Another neighbor, John O'Neill, attempted to provide first aid. Jeffrey told O'Neill that Kamron may have been on drugs.

When Police Officer Brian Kawamoto arrived at the scene, he found Kamron in the bathtub of her bathroom holding a razor blade in her hands which he directed her to put down. Kamron seemed "a little surprised." Officer Kawamoto did not have enough information to accurately determine whether Kamron was under the influence of a controlled substance, but she was cooperative and interacted with him in a manner he considered rational. A transcript of an audio recording made during the arrest indicates that after she was handcuffed, Kamron asked the police officers to cover her "like Rocky please. Balboa." She also asked the police officers where all the blood came from.

Jeffrey was taken to Harbor-UCLA Medical Center where he received medical treatment, including stitches. In a letter he sent to detectives during the middle of trial that was read into evidence, Jeffrey asked the court for leniency for Kamron. He also stated that he healed from his wounds and sustained no permanent injuries.

## B.    Charges, Trial, and Sentencing

Kamron was charged in a four-count information with attempted premeditated murder on June 27, 2016 (§§ 187, subd. (a), 664), that she used a knife within the meaning of section 12022,

6

subdivision (b)(1), and inflicted great bodily injury within the meaning of section 12022.7, subdivision (e)(1) (count 1); injuring a spouse (§ 273.5, subd. (a)) on June 27, 2016, adding the same knife and great bodily injury allegations (count 2); injuring a spouse (§ 273.5, subd. (a)) on June 26, 2016 (count 3); and injuring a spouse (§ 273.5, subd. (a)) on February 14, 2016 (count 4).

Count 4 was dismissed following defense counsel's motion pursuant to section 1118.1.

The jury unanimously acquitted Kamron of the attempted murder charged in count 1, but convicted her of the lesser included offense of attempted voluntary manslaughter. She was also convicted of two counts of injuring a spouse, and the jury returned true findings on the enhancements.

The trial court sentenced Kamron to a total term of eight years in state prison, calculated as follows: the middle term of three years on the lesser of count 1, plus four years for the section 12022.7, subdivision (e) enhancement, plus one year for the section 12022, subdivision (b)(1) enhancement. The sentence on count 2 and the corresponding enhancements was ordered stayed pursuant to section 654, while the three-year sentence imposed on count 3 was ordered to run concurrently to that of count 1.

Kamron filed a timely notice of appeal.

## DISCUSSION

Kamron argues prejudicial error in the jury instructions requires reversal. The court's instructions on voluntary intoxication and attempted voluntary manslaughter did not inform the jury that voluntary intoxication was a defense to *both* attempted first degree murder and attempted voluntary manslaughter. Instead, the voluntary intoxication instruction only explicitly referenced the attempted murder charge. Moreover, the

7

prosecutor compounded the error during closing argument by telling the jurors that voluntary intoxication only applied "to count 1, the attempted murder." This meant the jury did not know, according to Kamron, that if it found Kamron was voluntarily intoxicated, her intoxication not only negated the specific intent necessary for attempted murder, but also the specific intent necessary for attempted voluntary manslaughter. She also argues the trial court was under a sua sponte duty to accurately instruct the jury once it agreed to instruct on voluntary intoxication but it did not, and thus, reversal is required. We disagree.

Kamron's counsel below advanced *two* defense theories. One theory was that involuntary intoxication negated the specific intent necessary for both attempted murder and attempted voluntary manslaughter. The second theory was imperfect self-defense: Kamron was a victim of prolonged domestic violence, "a battered woman," and she was under the influence.

It is therefore untrue that the jury necessarily found Kamron voluntarily intoxicated to the point she was incapable of forming specific intent and then failed to make the subsequent, logically necessary step of also acquitting her of the lesser included offense of attempted voluntary manslaughter because the jury had two paths to convict on the lesser included offense, not one. The jury could also have simply believed her alternative theory that her counsel repeatedly stressed below: imperfect self-defense by a battered, economically vulnerable, controlled woman who was also under the influence of methamphetamine. Defense counsel repeatedly stressed to the jury she could also be convicted of the lesser included offense based on imperfect self-defense. Because that theory does not depend on what Kamron argues is only a partially correct voluntary intoxication instruction, Kamron cannot demonstrate prejudice, and any error was harmless We also

8

disagree that the trial court committed prejudicial instructional error because the record reveals that the jury was adequately instructed when it was informed Kamron's intoxication negated specific intent to kill, and the jury was properly instructed specific intent to kill was an element of both attempted murder and attempted voluntary manslaughter.

## A.    Standard of Review

We review the jury instructions as a whole to determine whether "reasonably likely the jury misconstrued the instructions as precluding it from considering" voluntary intoxication as a defense against attempted voluntary manslaughter.  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1017.)  A trial court has no sua sponte duty to issue an instruction on voluntary intoxication, but if it chooses to do so, it must do so correctly.  (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.)  We may reverse a conviction only if the alleged error was prejudicial.  (See Cal. Const., Art. VI, § 13).  Whether error is prejudicial under California law is evaluated under the probability test of *Watson*.  Reversal is appropriate under *Watson* review only if " 'after an examination of the entire cause, including the evidence,' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Kamron concedes in her opening brief that our Supreme Court has held that we review alleged instructional errors involving the defense of voluntary intoxication under the *Watson* probability test.  (See *People v. Atkins* (2001) 25 Cal.4th 76, 93 [preventing jury from considering evidence of voluntary intoxication did not violate due process]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089 [misinstruction on voluntary intoxication defense violates state law only].)  The more searching "harmless beyond a reasonable doubt"

test articulated by the United States Supreme Court in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] does not apply here.

## B.    Applicable Law

Kamron was charged with attempted first degree murder, but was convicted of the lesser included offense of attempted voluntary manslaughter.  She put forth two defenses at trial: imperfect self-defense and voluntary intoxication.  We briefly review the elements of these two crimes and these two defenses.

All attempt crimes require specific intent.  "The crime of attempt occurs when there is a specific intent to commit a crime and a direct but ineffectual act done towards its commission." (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764; see generally 1 Witkin, Cal. Criminal Law (4th ed. 2020) Elements, § 57.)  Proof of attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Lee* (2003) 31 Cal.4th 613, 623.)

"Attempted voluntary manslaughter is the unlawful killing of a person without malice.  [Citation.]"  (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241.)  Manslaughter is voluntary when the killing is "upon a sudden quarrel or heat of passion."  (§ 192, subd. (a).)

The malicious intent required for attempted murder can be negated and the defendant can be convicted of the lesser included offense of attempted voluntary manslaughter in two ways pertinent here.  First, "[u]nder the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of

10

no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.)

Second, "evidence of voluntary intoxication is relevant to the extent it bears upon the question whether the defendant *actually* had the requisite specific mental state required for commission of the crimes at issue." (*People v. Horton* (1995) 11 Cal.4th 1068, 1119; see also *People v. Williams* (2001) 26 Cal.4th 779, 789 ["evidence of voluntary intoxication would be admissible with regard to whether a defendant had the requisite intent for a criminal attempt"].)

## C.     The Court's Instructions

Because this is an appeal arguing prejudicial instructional error, we review the pertinent instructions.

The trial court instructed the jury on the lesser included offense of attempted voluntary manslaughter with CALCRIM Nos. 603 and 604. CALCRIM No. 603 instructed the jury that it could acquit on the attempted murder charge and convict on the lesser included crime of attempted voluntary manslaughter via the heat of passion or sudden quarrel defense. CALCRIM No. 604 gave the corresponding instruction that it may reduce the attempted murder charge via the imperfect self-defense doctrine. (See *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1307 [approving CALCRIM No. 604].)

As to voluntary intoxication, the court instructed the jury with CALCRIM No. 625 as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or, the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could

11

produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose. [¶] Voluntary intoxication is not a defense to [c]ounts 2 and 3, inflicting injury on a spouse."

## D. The Court's Instructions Were Correct, and Any Error Would be Harmless

Kamron begins her argument by observing that neither the voluntary intoxication instruction nor the manslaughter instructions ever informed the jury that voluntary intoxication was a defense to attempted voluntary manslaughter. Kamron further argues that the attempted voluntary manslaughter instruction affirmatively misled the jury because it specifically indicated that the defense was only applicable to count 1.[5] And, finally, count 1 charged "attempted murder"—it did not charge attempted voluntary manslaughter.

Kamron next observes the prosecutor obscured the matter further by arguing during rebuttal: "Now addressing voluntary intoxication. This only goes to count 1, the attempted murder. You can consider it only in a limited way, whether or not the voluntary intoxication of that person, of the defendant, affected or negated her intent to kill or her ability to deliberate and premeditate."

Moreover, Kamron argues the jury's acquittal on the attempted murder charge suggests it was evidently persuaded Kamron was voluntarily intoxicated to the point she lacked the capacity to form the requisite specific intent for attempt.

---

[5] To be precise, the instruction indicated voluntary intoxication only applied to the attempted murder charge indirectly: "Voluntary intoxication is not a defense to [c]ounts 2 and 3" logically implies it *is* a defense to the remaining count, viz., count 1.

Kamron also argues the trial court erred as well by failing to sua sponte instruct the jury that voluntary intoxication could also negate the specific intent required for the crime of attempted voluntary manslaughter.

We disagree for two reasons. First, the jury was given a correct set of instructions. Second, any instructional error was harmless.

1. *The Trial Court Issued Correct Instructions*

The trial court's instructions correctly stated the law. In *People v. Blakeley* (2000) 23 Cal.4th 82, 85, our Supreme Court held that a defendant is guilty of voluntary manslaughter if either (i) the defendant "unlawfully kills in a sudden quarrel or [in] the heat of passion," or (ii) "unlawfully kills while having an unreasonable but good faith belief in the need to act in self-defense." CALCRIM Nos. 603 and 604 correctly reflect *Blakely*.

Our Supreme Court has also expressly approved the voluntary intoxication instruction, CALCRIM No. 625 in *People v. Soto* (2018) 4 Cal.5th 968, 970: "CALCRIM No. 625 correctly permits the jury to consider evidence of voluntary intoxication on the question of whether defendant intended to kill . . . ."

CALCRIM No. 625 clearly stated that evidence of voluntary intoxication could be considered in determining whether Kamron "acted with an intent to kill." And the two attempted voluntary manslaughter instructions, CALCRIM Nos. 603 and 604, both listed as elements, "The defendant intended to kill."

Assuming for a moment that the jury acquitted Kamron on count 1 by applying the voluntary intoxication defense (and not by relying on imperfect self-defense), nothing in these instructions prevented the jury from also applying the voluntary intoxication defense to negate the intent to kill element of attempted voluntary manslaughter. Being voluntarily intoxicated negates the specific

13

intent to kill, whether it appears as an element of attempted murder or as an element of attempted voluntary manslaughter. (See *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824 ["The requisite intent for first degree murder on a premeditation and deliberation theory and the intent necessary for voluntary manslaughter are identical: both crimes require the specific intent to kill"].)  Moreover, " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.)

Finally, as we explain in the next subsection, defense counsel argued voluntary intoxication *was* a defense to both attempted murder and attempted voluntary manslaughter.

We do not find instructional error on this record.  It is not " 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence" (*People v. Mendoza*, *supra*, 18 Cal.4th at p. 1134), as it applied to both count 1 and the lesser included offense of attempted voluntary manslaughter since the intoxication defense functions in the same way for both crimes: it negates the necessary element of an intent to kill.

2.    *Any Error Was Harmless*

We are also unable to find prejudice on this record under *Watson* review.

Defense counsel argued the following during her closing:  "I believe that as far as the remaining counts, count 1, the attempted murder, there is absolutely no evidence that she intended to kill [Jeffrey].  And as I said, there are two reasons for that, two very big legal reasons plus many factual reasons."

14

The "two very big legal reasons" counsel was referring to were Kamron's imperfect self-defense theory and her involuntary intoxication defense.

As defense counsel explained: "We also believe that [Kamron] acted in self-defense. And based on her inability to intend to kill and the actual wounds that were inflicted, she's not guilty. She's not guilty of attempted murder. She's not guilty of attempted voluntary manslaughter. [Jeffrey] was the aggressor, and he admitted it. He came in that afternoon itching for a fight. He says I wanted to make her feel like she had made me feel, but of course, he thinks he's smart enough to know that he can say anything and not be held accountable for it. Anything up to the edge. But that coupled with his physical aggression toward [Kamron] is not only words, it's the accumulation of that abuse and words with actual physical behavior."

The reason why Kamron attacked Jeffrey, her counsel offered, was that she was "a battered woman." "The law and the psychology of intimate partner abuse," counsel explained, shows "how years and years of abuse build up and make you respond differently." This is why, although "there's no denying that [Jeffrey] was cut, [Kamron] didn't intend to kill him."[6]

Thus, as Kamron's counsel repeatedly stressed, the jury had two different paths to acquit on attempted murder and acquit on the lesser included offense of attempted voluntary manslaughter: imperfect self-defense and voluntary intoxication. Thus it does not follow from the jury's acquittal on count 1 that the jury found Kamron was voluntarily intoxicated. The jury could also have

---

[6] Kamron also called Dr. Michelle Margules as an expert witness to testify to the effects of prolonged spousal abuse and domestic violence.

acquitted on count 1 because the jury found Kamron sincerely, but unreasonably, believed she was in imminent danger of death or great bodily injury under the imperfect self-defense doctrine.

Only one of these two hypothetical explanations is arguably tainted by lack of instructional clarity, viz., the jury's inconsistent application of the voluntary intoxication defense. The alternative explanation that the jury applied the imperfect self-defense doctrine cannot be declared improbable on this record.

We therefore affirm the jury's verdict. Any error the court made by failing to give a more particularized voluntary intoxication instruction that also applied to the lesser included offense would not have made it "reasonably probable" Kamron would not have been convicted of attempted voluntary manslaughter.

### DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED

SINANIAN, J.[*]

We concur:

CHANEY, J.

BENDIX, Acting P. J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.